VAN HOUTON v. THE PEOPLE.

22   53
29   159
22   53
23   497

1. BILL OF EXCEPTIONS IN CRIMINAL CASES.

Bills of exception in criminal cases may be signed during the term at which such exceptions were taken, or at any time thereafter fixed by the court.

2. APPELLATE PRACTICE.

When the motion for a change of venue in a criminal case and the affidavits in support thereof are not preserved by bills of exception, the ruling thereon cannot be reviewed.

3. SAME.

The ruling of the court below with respect to challenges of jurors for cause is immaterial when it appears that none of the jurors so challenged served upon the trial, and that the defendant had not exhausted his peremptory challenges.

4. INSTRUCTIONS NEED NOT BE REPEATED.

It is not error to refuse instructions requested when such instructions have been fully covered by the charge of the court.

5. MURDER—DELIBERATION AND PREMEDITATION.

To warrant a conviction of murder of the first degree where the killing was by shooting, the proof must establish deliberation and premeditation. Time is not essential if there was a design and determination to kill found in the mind of the defendant previous to or at the time the mortal wound was given. It matters not how short the interval, if it was sufficient for one thought to follow another, and the defendant actually formed the design to kill, and deliberated and premeditated upon such design before firing the fatal shot, it will be sufficient to raise the crime to murder of the first degree.

6. SAME.

In murder cases, premeditation and deliberation are matters of inference and presumption to be drawn by the jury from the facts and circumstances leading up to, surrounding, and explanatory of, the homicide.

*Error to the District Court of El Paso County.*

AT THE May, A. D. 1895, term of the district court of El Paso county, plaintiff in error was tried, convicted and sentenced for murder of the first degree. To review the proceedings of the district court he brings the case here upon error.

Mr. J. K. GOUDY and Mr. J. K. VANATTA, for plaintiff in error.

THE ATTORNEY GENERAL and Mr. F. P. SECOR, of counsel, for The People.

CHIEF JUSTICE HAYT delivered the opinion of the court.

Before entering upon a consideration of the errors assigned by plaintiff in error, we will consider an alleged defect in the record to which our attention is directed by the attorney general. This relates to the bill of exceptions which has been certified to this court. This bill was not signed until after the trial in the court below had been concluded and judgment rendered, and it is contended that it was then too late; hence we are asked to exclude the bill from consideration upon this review. The position of the attorney general in this behalf is based upon section 1477 of Mills' Annotated Statutes, in which it is provided that "in the trial of any person or persons for any crime or misdemeanor, it shall be the duty of the judge before whom such trial is pending, to sign and seal any bill of exceptions rendered to the court during the progress thereof."

At common law the right to preserve for review by bill of exceptions matters not appearing upon the record proper must find support in some statute. The right being statutory, a statute providing for the signing of the bill during the progress of the trial does not, it is said, permit a bill to become a part of the record if signed even one day late, as

in this case.    Plaintiff in error has presented no argument
in opposition to the position taken by the attorney general,
but we find upon examination that there is a statute other
than the one above quoted, which appears to be in full force
and effect.    By this later statute it is provided that the bill
may be signed at any time during the term or within any
time beyond the term fixed by the court.

Our investigation shows that the section relied upon by
the attorney general was passed in 1861, while the one to
which we allude was enacted four years thereafter.    It reads:

"In all cases in the district court where either party shall
except to any ruling, decision or opinion of the court, and
shall reduce such exception or exceptions to writing, it shall
be the duty of the judge to allow the same, and to sign and
seal the same at any time during the term of the court at
which such exceptions were taken, or at any time thereafter
to be fixed by the court."    See Session Laws 1865, p. 92,
sec. 3; Rev. Statutes of 1868, p. 508, sec. 21.

The act of 1865 was under consideration by this court as
early as the case of *Smith v. The People*, 1 Colo. 141, and
was then held to apply to criminal cases.    A careful investi-
gation fails to disclose that this statute has ever been re-
pealed in so far as it applies to criminal cases.    It is true,
there was an ineffectual attempt to repeal it by the Civil
Code, enacted under the following title: "An Act Providing
a System of Procedure in Civil Actions in the Courts of
Justice of the State of Colorado."    The constitution, section
21, article 5, provides:

"No bill except general appropriation bills shall be passed
containing more than one subject, which shall be clearly ex-
pressed in its title; but if any subject shall be embraced in
any act which shall not be expressed in the title, such act
shall be void only as to so much thereof as shall not be so ex-
pressed."

It is obvious that the attempted repeal of the act of 1865,
in so far as the same relates to criminal practice, was ineffect-
ive and void under the title adopted for the Code of Civil
Procedure.

We have not overlooked the statement by the compiler of the Revised Statutes of 1868 to the effect that the statute of 1865 was repealed, but as the repealing act reënacted the paragraph under consideration *verbatim*, in effect this paragraph was not repealed, but has been the law all the time. We are, therefore, of the opinion that the act of 1865 is still a live statute in so far as criminal cases are concerned, and that bills of exceptions in such cases may be signed during the term at which such exceptions were taken or at any time thereafter to be fixed by the court. This construction is in accordance with the practice for thirty years, and we are not now disposed to consider favorably objections to it.

Plaintiff in error complains because the district court overruled a motion for a change of venue. This motion bears date February 14, 1895, and by its terms refers to an information filed January 15, 1895, while the record in this case shows that the plaintiff in error was tried and convicted upon an information bearing date May 14, 1895. The record is not complete, but sufficient appears to show that the defendant was first indicted jointly with one Yeoman and one Hoskins for the murder of the deceased; that afterwards a separate information was filed charging this defendant with this murder. The trial and conviction were had upon this last information, while the motion for a change of venue appears to have been filed in the first case, and for this reason cannot be considered in connection with the record now before us for review. Aside from this, neither the motion nor the affidavits in support thereof are preserved by a bill of exceptions, and for this additional reason cannot be reviewed by this court.

Under our practice, a motion for a change of venue is addressed to the sound discretion of the trial court, and its rulings thereon will not be reversed upon review except in cases of manifest abuse of such discretion; but where in a criminal case the defendant desires a review of an order overruling his motion for a change of venue, the motion, together with all affidavits filed, whether in support or in oppo-

sition, should be preserved by a bill of exceptions properly certified into this court.

The next error discussed brings up for review the action of the district court in overruling certain challenges for cause interposed by plaintiff in error to certain jurors upon the panel out of which the jury to try the cause was selected, but as none of these jurors served upon the trial of the case, the ruling of the court with reference to such challenges is immaterial, as plaintiff in error failed to exhaust his peremptory challenges.

It appears from an affidavit to be found among the files of the case that during the examination of one of the jurors plaintiff in error voluntarily absented himself from the court room for a few minutes. While absent he was in charge of a sworn officer, but his absence does not appear to have been noticed by court or counsel for a time. When noticed, the proceedings were stopped until the defendant came into the court room, when the examination of the jury was renewed. The juror examined during defendant's absence was challenged by his counsel, and did not serve upon the panel that tried the case, but we are now asked to grant a new trial on account of such voluntary absence of the defendant.

The record shows the personal presence of the defendant, and it cannot be contradicted in the manner resorted to in the case. Moreover, the facts alleged would afford no ground for a new trial if they were properly authenticated.

The charge of the court to the jury is plain and explicit upon every proposition of law applicable to the evidence, and is free from error prejudicial to the defendant. The presiding judge not only gave full instructions upon the law of self defense, which seems to have been the chief reliance of the accused, but he repeats in varying form such portions of this law as would be likely to appeal most strongly to the jury in behalf of the defendant.

So, also, the distinguishing features between murder of the first degree and murder of the second degree, and between both kinds of murder and manslaughter, are carefully

pointed out and emphasized by repetition. The complaint that is now made because certain instructions asked by defendant were not given in the precise language of his counsel is fully answered by the record, showing, as it does, that such instructions were fully covered by the charge as given by the court.

It is claimed, finally, that the evidence does not justify a verdict of murder of the first degree. Every witness to the shooting of the deceased by the defendant that could be found was introduced by the state, thus giving the defendant whatever benefit might arise from a thorough cross-examination of the many witnesses to the homicide. In this respect the conduct of the district-attorney is to be commended.

There is but slight conflict in the evidence upon the material facts of the case, except as such conflict arises by reason of the testimony of the defendant himself. The circumstances leading up to and culminating in the homicide are as follows: In the year 1894 the Midland Terminal Railroad was in progress of construction from a point on the Colorado Midland Railroad to the gold fields of Cripple Creek. The deceased, Richard Newell, Jr., was the superintendent of construction and the general superintendent of the road. The line as surveyed ran across a mining claim known as the "Black Wonder," the cabin on this claim standing in the direct line of the road. This mining claim was owned by Sylvester Yeoman, and the cabin by Yeoman and two others, of whom the defendant was not one.

There was a dispute between the owners of the claim and the Railroad Company in reference to this right of way, which dispute seems to have engendered hot blood on both sides. Pending an adjustment of the matter, the road was constructed across the claim or roadbed, curving sharply to avoid the cabin. The controversy over the right of way was finally submitted to two arbitrators with power to select a third in case of failure to agree.

The two arbitrators selected by the parties reached an

agreement to the effect that the company should pay the sum of one hundred ($100) dollars to Yeoman as damages to the mining claim, and the further sum of fifty ($50) dollars to the owners of the cabin to cover the expense of moving the same, and, award having been made in accordance with this agreement, the entire sum was paid over a short time prior to the date of the homicide.

On the 19th day of December, A. D. 1894, the cabin, at the time not yet having been removed, was occupied by the defendant Van Houton and the witness Hoskins. The occupants had been at work the day of the homicide upon neighboring properties, but were, at the time, occupying the cabin upon the Black Wonder claim by permission from the owners. Upon that day the men had worked as usual, returning to the cabin shortly after 4 o'clock in the evening. Hoskins, who acted as cook, immediately set about preparing the evening meal, the defendant being at the time in the cabin. About this time the deceased was on a special train that was going up the railroad from a point named "Grassy." When the engine of this train reached a point directly opposite the Black Wonder cabin, the train was brought to a stop at a signal from Newell, who was on a car which stopped a short distance from the cabin.

As soon as the train stopped, Newell jumped from the car and walked rapidly toward the cabin, entering the open door. There were then in the cabin the defendant and the witness Hoskins. As to what immediately followed, Hoskins, who was a witness in the district court, states:

"When Newell came in the defendant came forward to Newell, and Newell said, 'Where is the man I saw the other day?' Defendant said, 'I guess it is me you mean, Mr. Newell.' Newell said, 'No, it is not you I mean at all, I mean the man I saw the other day.' I knew of course who he meant, and I said, 'I guess it is Mr. Yeoman you mean, Mr. Newell.' Mr. Newell then pulled a letter out of his pocket and the defendant said the same, 'I guess it is Mr. Yeoman you mean.' Mr. Newell pulled a piece of paper out

of his pocket, and said 'I have a letter here,' and the defendant took that letter and read it. The defendant held the letter in just this position [illustrating] just that way. The defendant stood by the side of the doorway. The door opened on the inside of the cabin. Newell stood with his back opposite the defendant's on one side. I stood back and sort of between both men. In the meantime while defendant was reading the letter I looked out and saw two men on that train. One man was Conductor Blizzard on the top of Newell's car and the other was on the platform of the car, but who he was I don't know. I stepped a little further back and while the defendant was reading the letter I saw 150 marked on the letter in figures. I could not swear whether it was $150 or not, but it was 150 in figures all right. When the defendant got through reading the letter, he said to Mr. Newell, 'Well, Mr. Newell, that is all right, but' — going to explain himself. Newell spoke up and said 'I shall pull this cabin down to-morrow morning.' The defendant said, 'I don't know about that.' Newell said, 'I will pull it down anyhow.' Then Newell moved to go out of the doorway. Then I turned around to go to the other side of the cabin to take off my coat and hat and hang them up, as I had them on when I came in the cabin, with the intention of going to the stove and attend to the supper, as there was no one else to do that. It was understood that when the defendant had anything else to do I did the cooking which I did. When I turned around from hanging up my coat and hat I saw Newell on the outside of the cabin and the defendant on the inside, and they were talking both at the same time, but I could not hear for the steam what they were saying. I stood there probably half a minute and then went to the stove. I concluded it was none of my business anyway, so I went to the stove. After I had been at the stove a very short time I could not hear the other man talking, so I said to myself Newell must be gone, and wondered why the defendant did not come in. I stepped back in the cabin,—there was a pile of wood behind the door that came out farther than the door, so I stepped

back far enough to see Newell and the defendant. The defendant had his fist up against Newell and Newell had his hands raised. I thought I would go back to the stove to save the things from burning, and then go and interfere, but when I got back to the stove I heard Newell say, 'You come outside and fight.' I just lifted a few dishes off the stove and put the lids on when I heard the defendant say, 'You son ——————,' and I turned around and the defendant had his gun lifting it from the side of the bunk. All he had to do was to turn half way round and reach the gun from where he was standing. I jumped back just enough to see how he held the gun then I took my eyes off him to put a pan or pot on the floor, but before I got them on the floor the shot was fired. All the words that were said from the time the defendant got his gun down were Newell said, 'That is the only way you will come out.' * * * I did not see that Newell was hurt and felt glad of it. The trainmen had started from the car to Newell and I kept my eyes mostly on Newell. I looked at the defendant once or twice. I could see Newell and there was a big tie right behind him and he seemed to be trying to step back to it, but on account of that tie he could not make any headway backwards. The men from the train were getting close to Newell at that time, and I could see that Newell was in a terrible condition, with his hand on his side trying to support himself, and the men from the train got around Newell just in time to save him from falling on the ground. He fell in their arms and they took him to the car. The defendant stood there on the bank and never moved at all. I did not go anywhere myself. The conductor came out of the car going back to give the engineer orders or something, and as both men walked back, the defendant and conductor, the defendant on the bank and the conductor down on the grade, the cabin was between the two men and I was between the men, and the defendant said to that conductor, 'I don't allow any —————— to pull a cabin down after me.'

"Q. Who was that conductor? A. I don't know his name.

" Q. Was it conductor Blizzard? A. No, sir, I know him

" Q. Was it the conductor of the work train? A. He was the man that went back to the cabin after that.

" Q. Proceed with your story. A. That conductor said to the defendant, ' You don't need to talk about it, my friend, that man is dead.' "

The ball entered Newell's breast near the left nipple and passed through his body. After he was shot he ran sideways about 20 feet, where he fell, and immediately expired. During most of the time that Newell was in the cabin he was out of the sight of the men upon the train, and during the entire period from the time he entered the cabin until the mortal wound was given the steam from the engine was making so much noise that none of the trainmen could hear what was being said by either Newell or the defendant, although some of them were on the cars only a few feet away, but from the time the deceased stepped from the door of the cabin until he fell mortally wounded he was in the plain view of a large number of the trainmen and others. As to what occurred during this brief period the evidence of these witnesses is in all substantial particulars identical.

The testimony of Ira Blizzard, the conductor of the special train, is in substance as follows:

We reached the cabin about 4:45 P. M. The train stopped upon a signal from Mr. Newell. The pilot of the engine stood about even with the south corner of the cabin and the cars were on the south end of the train, as the train was running backwards. Mr. Newell was on the platform of the special car, and this was about 75 feet from the cabin when the train was brought to a standstill.

Mr. Newell got off and went into the cabin. I stood on the top of the second car and about 60 feet from the cabin. Mr. Newell was in the cabin perhaps three or four minutes, and then I saw him back out. As Mr. Newell stepped out of the cabin, Van Houton followed to the doorstep, and I think put one foot outside, but about that time he stepped back and reached with his right hand and got a rifle or gun,

then stepped again to the door, pointing the gun towards Mr. Newell.   Mr. Newell then grabbed the gun.   Van Houton stepped back into the cabin, jerking the gun away.   Newell then stepped back a little further from the cabin.   The defendant then stepped to the door again, and Newell was making some motion with his hand, as though he was arguing some point.   He had taken a step toward the cabin when the defendant raised the gun partly to his shoulder, and fired. I could not hear the conversation between these men.   When Mr. Newell stepped out of the cabin he had a piece of writing paper in his left hand, which he folded up and placed in his inside left hand coat pocket.

The paper which Newell took out of his pocket and handed to Van Houton in the cabin, and which the deceased subsequently folded and replaced in his coat pocket, is shown to have had reference to the award of the arbitrators.   The paper as identified by the witnesses for the state reads as follows :

"CRIPPLE CREEK, COLO., Dec. 13th, 1894.

"R. NEWELL, JR., Gillette, Colo.

"*Dear Sir :*—Yours of the 12th to hand, contents noted. The decision in the case of the Midland Terminal Railway Company vs. the Black Wonder claim, was that the sum of $150.00 covered *every* and *all* damage sustained by the Black Wonder owners by reason of said road going through their claim.

"The damage to the cabin *entire* was fixed at $50.00 and the damage to the *entire* claim was fixed $100.00, making a total sum of $150.00 for *all* damages.

"Yours truly,

"J. W. WATSON."

Van Houton says that the foregoing is not the paper which he was handed by the deceased, but he admits that the paper given him to read was similar in character.   This paper and the evidence in reference thereto were properly admitted as part of the *res gestæ.*

Some ten or a dozen witnesses were examined on the part of the prosecution. Their testimony is not materially different from that of the witness Blizzard. The evidence of these witnesses is to the effect that about one minute elapsed from the time Newell stepped from the cabin until the fatal shot was fired, during which time the defendant, standing with his gun in his hands pointed towards the deceased, had him completely at his mercy.

But two witnesses are introduced on the part of the defendant. One was J. C. Sterling, a deputy sheriff. This witness was not present at the time of the shooting. He testified that Newell told him a few days before that there was liable to be trouble there at the cabin; that they had threatened to shoot some of the railroad men, and said he would like to have me go up and see them. In pursuance of this conversation I did go up and talked with the men at the cabin. The defendant was not present at the time. I told the men that were there that there was a better way to settle the controversy than by shooting, but that if there was going to be any shooting I should like to be present.

Van Houton, the defendant, testified in his own behalf. His testimony, in so far as it differs essentially from that of the prosecution, will sufficiently appear from the following summary:

The witness stated that he and Newell were strangers to each other; that he (the witness) had no interest in the Black Wonder claim or in the cabin; that he noticed that at the time Newell came up he was either under the influence of liquor or was angry about something. I did not know his name until after the shooting was over. When he came in he asked who was the general here. I said, "I am supposed to have charge of the lease on the Nancy Hanks and Victoria claims." He says, "I have a letter for you," and selected from a package a letter, took it out of the envelope, opened it up and handed it to me. I read the letter and handed it back to him, and told him he would have to see Mr. Yeoman, as it did not concern me. He says, "I am going

to tear this cabin down if I have to kill you people to do it." The witness then testifies to much foul and abusive language, which he says defendant used towards him, and that he made an attempt as though to strike the witness. He says that after Newell passed out of the door he threatened to come back and pull him out; that it was at this time that he reached up and grabbed his gun, and I said, "I have no occasion to go out," and asked him to go away. He said, "I will come in there and take the gun away from you and kill you." He made a grab at the gun and pulled his pistol at the same time I fired. At the time the shot was fired he was outside, in the act of stepping upon the high bank. He made a step like this (illustrating), and threw his hand behind his back as if to grab my gun with his left hand and draw his gun with his right hand. That was the time I fired. I did not take aim; the gun was down not higher than my thigh.

All the other witnesses to the transaction swear positively that Newell had no weapon of any kind in his hand at the time, and that he did not attempt to draw a pistol, and made no motion that could be construed as indicating any such attempt; while several swear that Newell's attitude was argumentative rather than aggressive; that at the time of receiving the mortal wound he stood with one hand raised as "though explaining something." It is conclusively shown that Newell had no weapon on his person at the time.

Is there evidence in this record which, if believed by the jury, will support a verdict of murder of the first degree under the statute of this state which reads as follows:

"Malice shall be implied when no considerable provocation appears, or when all circumstances of the killing show an abandoned and malignant heart. All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing; or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem or burglary; or perpetrated from a deliberate and premeditated design, unlawfully and maliciously, to effect the death of any human being

other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree. The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree." 1 Mills' An. Statutes, sec. 1176.

The entire evidence, excepting only that of the accused, negatives the conclusion that this was a case of mutual combat, and thereby excludes the idea of manslaughter. So, also, the plea of self-defense is not within our consideration, and it is negatived by all the evidence except that of the defendant, and was resolved against him by the jury.

The crime of murder alone remains. This the statute divides into two degrees, *i. e.*, murder of the first degree and murder of the second degree. Murder being established, the law in its humanity declares it to be murder of the second degree in the absence of circumstances showing it to have been murder of the first degree.

In this case the proof must establish *deliberation* and *premeditation* to support the verdict. Time, however, is not essential if there was a design and determination to kill formed in the mind of the defendant previous to or at the time the mortal wound was given. It matters not how short the interval, if it was sufficient for one thought to follow another, and the defendant actually formed the design to kill, and deliberated and premeditated upon such design before firing the fatal shot, this was sufficient to raise the crime to the highest grade known to the law.

By the statute the jury are expressly authorized to designate the degree in case murder is established. In this respect it is quite similar to the act of 1870. Under these acts premeditation and deliberation are matters of inference and presumption to be drawn by the jury from the facts and circumstances leading up to, surrounding and explanatory of the

homicide.  *Hill v. The People*, 1 Colo. 436;  *Power v. The People*, 17 Colo. 178.

The evidence for the state shows that when Newell stepped outside of the cabin the defendant followed him to the door; that he armed himself with a loaded rifle, and pointed it at the deceased; that he had his victim entirely within his power for the space of perhaps one minute before firing, the deceased at that time having his hand raised in argument; that the rifle when discharged was aimed at the most vital part of the human body,—the heart.  In view of these circumstances, we cannot say as a matter of law that the verdict is not warranted by the evidence.

Finding no error in the record, the judgment will be affirmed, and the calendar week commencing December 22, A. D. 1895, is designated as the week for carrying the judgment of the district court into effect.

*Affirmed.*