[No. 6104.]

## WICKHAM v. THE PEOPLE.

1. **Information—Affidavit to Support—Sufficiency.**

   3 Mills' (Rev.) Stats., § 1432h, authorizes a district attorney in certain cases to file an information upon affidavit of any person having knowledge of the commission of an offense, who is a competent witness to testify in the trial of the case, setting forth the offense and the name of the person committing the same. Held, that an information in conformity with the statute cannot be attacked on the ground that the affiant did not have personal knowledge of the commission of the offense. —P. 347.

2. **Appellate Practice—Criminal Cases—Harmless Error.**

   3 Mills' (Rev.) Stats, § 1432b, requires the district attorney to indorse on the information the names of witnesses known to him at the time of filing the same, and the names of other witnesses becoming known to him before the trial, but provides that witnesses whose names or the materiality of whose testimony are first learned by the attorney upon the trial may be called without such indorsement. Held, that although the statute is mandatory, and it is the duty of the district attorney to comply with it, it was not reversible error to allow, on the day before a case was set for trial, the district attorney to indorse upon the information the names of additional witnesses

said to have been known to him when the information was filed, where defendant did not apply for a continuance nor make a showing of surprise or prejudice, and where no such showing is made on appeal.—P. 348.

3. **Practice in Criminal Cases—Witnesses—Leading Questions—When Permissible.**

It was proper to allow the district attorney in a criminal case to ask a witness leading questions, where the witness had made a previous statement to him, a portion of which the witness was attempting to conceal to the district attorney's surprise, the questions objected to being asked to refresh the witness's recollection.—P. 349.

4. **Practice in Criminal Cases—Homicide—Evidence—Order of Proof—Withdrawing Evidence.**

In a murder trial, it was proper for the court upon its own motion to orally withdraw from the jury testimony relating to decedent's reputation for peace, etc., where it was received upon the supposition that it would be made competent by subsequent testimony, and the subsequent testimony was not offered; nor was defendant entitled to have such withdrawal reduced to writing, since it was in no sense an instruction.—P. 350.

5. **Practice in Criminal Cases — Homicide — Murder—"Cooling Time"—Instruction—When Properly Refused.**

In a murder trial, it was proper to refuse to instruct respecting "cooling time" where accused went to a house and remained there an hour or more and discussed charges of immoral conduct said to have been made against him by decedent, and, putting a gun in his pocket, declared he was going to hunt decedent, and, meeting decedent a short distance from the house, struck him; and, while decedent was retreating, shot him, walked three blocks, talked with several persons, examined a cut in his neck inflicted by decedent, and ten or fifteen minutes later returned to where decedent lay and killed him.—P. 352.

6. **Practice in Criminal Cases—"Cooling Time"—Question of Law.**

"Cooling time" is a question of law for the court, and not a question for the jury.—P. 356.

7. **Practice in Criminal Cases—Homicide—Murder in First Degree—Deliberation—Instructions.**

An instruction that if one actually forms the purpose maliciously to kill another, and deliberates and premeditates upon it before performing the act, and then performs it, he is guilty of murder in the first degree, no matter how short the time may have been, if but the time necessary for one thought to follow

another between the purpose and its execution, correctly states
the law.—P. 357.

8.  Appellate Practice—Practice in Criminal Cases—Homicide—
     Harmless Error—Instructions.

In a murder trial, an erroneous instruction taking from the
jury the consideration of all degrees of murder excepting the
first, is not ground for reversing a conviction in the first degree
and a sentence of life imprisonment, where the entire evidence,
including that of the accused, excludes the idea of manslaughter
and fully warrants the conviction and the infliction of the death
penalty; and where, if the jury had returned a verdict in the
second degree, the judge would have been in duty bound to im-
pose a life sentence.—P. 358.

*Error to the District Court of the City and County
of Denver.*

*Hon. E. E. Armour, Judge.*

Peter Wickham was convicted of murder in the
first degree, and he brings error.      *Affirmed.*

Decision *en banc*, Mr. JUSTICE BAILEY and Mr.
JUSTICE CASWELL dissenting.

Messrs. MORRISON & DESOTO and Messrs. MOR-
RISON & BAILEY, for plaintiff in error.

Mr. WILLIAM H. DICKSON, attorney general, and
Mr. SAMUEL H. THOMPSON Jr., assistant attorney
general, for the people.

Mr. JUSTICE MAXWELL delivered the opinion of
the court:

Under an information charging murder, plain-
tiff in error was convicted of murder in the first de-
gree and sentenced to the penitentiary for life.

1.  The court overruled a motion to quash the
information, based upon the ground that the infor-
mation was not supported by the affidavit of any
person having knowledge of the commission of the
offense, as required by § 1432h, 3 Mills' (Rev.)
Stats., the pertinent part of which is:

"But if a preliminary examination has not been had, or when upon such examination the accused has been discharged, or when the affidavit or complaint upon which the examination has been held has not been delivered to the clerk of the proper court, the district attorney may, upon affidavit of any person who has knowledge of the commission of an offense, and who is a competent witness to testify in the case, setting forth the offense and the name of the person or persons charged with the commission thereof, upon being furnished with the names of the witnesses for the prosecution, by leave of court first had, file an information, and process shall forthwith issue thereon."

The affidavit was in conformity with the requirements of the statute.

Where this is true, this court has held that an information cannot be attacked upon the ground that the party who verified it did not have personal knowledge of the commission of the offense charged.— *Holt v. People,* 23 Colo. 1; *Bergdahl v. People,* 27 Colo. 302; *Barr v. People,* 30 Colo. 522; *Overland C. M. Co. v. People,* 32 Colo. 263.

2. Over the objection of plaintiff in error, the day preceding the day the case was set for trial, the district attorney, by order of court, was permitted to indorse upon the information the names of additional witnesses for the people.

This is claimed to be error upon the ground that the witnesses whose names were so indorsed were known to the district attorney at and before the time the information was filed.

Section 1432b, 3 Mills' (Rev.) Stats., referring to the duty of the district attorney in this behalf, provides:

"He shall indorse thereon the names of such witnesses as are known to him at the time of filing

the same, and shall also indorse upon such information the names of such other witnesses as may become known to him before the trial at such time as the court may, by rule or otherwise, prescribe; but this shall not preclude the calling of witnesses whose names or the materiality of whose testimony are first learned by the district attorney upon the trial.''

Three classes of witnesses are designated by the statute; those known to the district attorney at the time· of filing the information; those who shall become known before the trial; and, those whose names or the materiality of whose testimony are first learned upon the trial.

That this statute is mandatory can not be doubted. It is the duty of the district attorney to comply with it.

Justice to the accused demands such compliance, so that he may be fully advised of those who will confront him as witnesses at the trial.

No application for a continuance was made and no showing of surprise or prejudice was made by plaintiff in error, by reason of the action complained of, and there is no such contention here.

Plaintiff in error may have been fully advised as to what the witnesses would testify to; their character, and all other matters desirable for him to know.

Under this condition we cannot say that the action of the court was reversible error.—*Boykin v. People,* 22 Colo. 496, 498.

3. It is urged that error was committed in allowing the district attorney to ask a witness leading questions.

It appears that the witness had made a previous statement to the district attorney, a portion of which he was attempting to conceal, to the surprise of the district attorney.

The questions to which objections were made were propounded for the purpose of refreshing the recollection of the witness.

In *Babcock v. People,* 13 Colo. 515, 520, in discussing this subject, it is said:

"Under such circumstances, where a party is really taken by surprise at the conduct of his own witness, it is in the discretion, and is often the duty, of the trial court to allow a party to put leading questions to his own witness, as the only means of preventing an unwilling witness from concealing the truth by unsatisfactory or evasive answers; and, in extreme cases, where it is apparent that a witness is giving testimony contrary to the reasonable expectation of the party calling him, such party should be allowed to cross-examine such witness, for the purpose of refreshing his recollection, with the view of modifying his testimony or of revealing his real animus in the case."

In *Hickory v. U. S.,* 151 U. S. 303, the court said:

"When a party is taken by surprise by the evidence of his witness, the latter may be interrogated as to inconsistent statements previously made by him, for the purpose of refreshing his recollection and inducing him to correct his testimony."

The court committed no error in overruling the objections to the questions.

4. At the close of all the testimony, upon his own motion, the court withdrew from the consideration of the jury, testimony relating to the reputation of the deceased for peace and good order, stating that such testimony was received upon the supposition that it would be rendered material and competent by testimony offered later in the case, and that such later testimony was not forthcoming.

*Davidson v. People,* 4 Colo. 145, and *Babcock v.*

*People,* 13 Colo. 515, are cited in support of this assignment of error.

Neither case cited supports the contention of counsel. In both, evidence of uncommunicated threats made by the deceased against the accused immediately before the killing was excluded. This was held to be error. In the case at bar there is no evidence in the record to justify the admission of testimony as to the reputation of deceased for peace and good order.

There was no error in excluding the testimony under consideration.

The above ruling was made by the court orally. It was objected to upon this ground. It does not come within the rule which applies to oral instructions.

An instruction is thus defined: "An instruction is an exposition of the principles of law applicable to a case, or to some branch or phase of a case, which the jury are bound to apply in order to render the verdict, establishing the rights of the parties in accordance with the facts proved."—11 Enc. Pl. & Pr. 56.

The ruling was one which had been reserved upon the question of the admissibility of certain testimony, which had been admitted upon the statement of counsel that testimony to be subsequently offered would render it material. To hold that a ruling upon the admission or rejection of testimony, made during the progress of a trial, must be reduced to writing, would be an innovation. This is the ultimate result of counsels' contention. There is no merit in the assignment of error.

5. Plaintiff in error requested a number of instructions, many, if not all of which, were refused.

Counsel for plaintiff in error, in their printed brief and upon oral argument, discussed only those

assignments of error based upon the refusal of the court to give requested instructions relative to ''cooling time,'' and we shall confine our examination to such assignments.

A discussion of this assignment of error and others ·which are to follow, necessitates a statement of the evidence in the case.

Between 8 and 9 o'clock of the evening of April 21, 1906, Wickham, plaintiff in error, having put a gun in his hip pocket, left a hotel at Elyria in this city, and went to the house of Mrs. Erickson, where he met his wife, who was temporarily stopping with Mrs. Erickson, having recently left the county hospital. Some conversation took place between Wickham, his wife, Mrs. Erickson and others present, relating to remarks which Tom Darling, the deceased, is said to have made to Wickham's wife, to the effect that Wickham had had improper relations with another woman. Wickham's wife said to plaintiff in error that she was only fooling in what she told him and that he ought to have no feeling against Darling. Wickham took his gun out of his hip pocket, made threats against Darling, put the gun into his coat pocket and said that he was going out to hunt Darling. Mrs. Wickham, Mrs. Erickson and .others tried to dissuade him from having any trouble with Darling, and Mrs. Erickson told her daughters to hunt up Darling, warn him that Wickham was after .him and tell him to get away. It appears that an hour or more elapsed from the time when Wickham came to Mrs. Erickson's house and when he·left. Wickham left the house and, within a few feet thereof, met Darling coming towards the house with three others, accosted him, charged him with telling stories to his wife, struck him with his left fist and knocked him down. Darling arose and was knocked down by Wickham three times in succession. Wick-

ham testified that he knocked Darling down once, and that he (Darling) fell down twice. Five witnesses for the prosecution testified that Wickham knocked Darling down three times, and that when Darling arose the third time Wickham pulled his gun out of his coat pocket and began to beat Darling over the head with it. Wickham testified that he did not pull his gun until after he had discovered that he had been cut. Witnesses for the prosecution testified that Wickham did not discover that he had been cut until after he had beaten Darling with the gun, and that Darling was retreating on the run when Wickham followed him along the sidewalk to the line of a vacant lot, where Darling dropped to his hands and knees, and Wickham fell over him. Darling arose and started to run across the vacant lot when Wickham called to him to halt, which Darling did, and turned part way around, and Wickham shot him in the side. Darling fell in his tracks and Wickham started to walk up the street, cut across a vacant lot to 47th street, distant about half a block, walked along this street two blocks and a half to a barber shop, which he entered. On his way to the barber shop he stopped and talked to two or three different parties whom he met. After entering the barber shop he walked up to a mirror and examined the cut on the side of his neck. Wickham testified:

"I says 'Good God, fellows, I believe I am going to die,' I says 'he has cut my juglar vein.' With that I walked out of the shop."

A witness for the prosecution, who was in the barber shop, testified in answer to the question, "Was there anything else said there?" A.—"Why, there was nothing any more than after he had seen himself in the glass, and says, '——— ——— ——— ——— has got me; I am going back and finish him,' or something like that."

Another witness for the prosecution, who was in the barber shop, testified: "He pulled out a gun and he says, 'I have got one more shot in there and I will fix him,' and out he went."

A witness for the defense, who was in the barber shop, testified: "He said something about him, the fellow had got him and he had fixed the other fellow. At that he turned and he pulled his gun and pointed it towards me and I walked out."

As to what took place after plaintiff in error left the barber shop, he testified: "I walked down the street, and I met another fellow. He says, 'Pete,' he says, 'why don't you go to a doctor?' I says, 'I don't know where I can find one.' Well, after that I walked down and come across the lot. I says, 'He has, —— if he got me,' I says, 'I will get him.' I walked down through the vacant lot again and through the alley. I got around in the vacant lot where he was. He seen me and I seen him. He says, 'Never mind, you —— —— ——, I will get you yet.' At that I pulled away, and shot him again."

"Q.—What did you have in your mind at the time you left that barber shop with the gun in your hand, if you had it in your hand? A.—Well, after I seen I was bleeding so, and after they said I would bleed to death if I didn't get that blood stopped, why, I would bleed to death, and I thought then that when this Darling dropped, he dropped just for a stall, like he did on the sidewalk, and I thought as long as I was going to die, why, I thought I would get him.

"Q.—And then you intended to kill him at the time you started from the barber shop; isn't that true? A.—Well, I didn't exactly intend to kill him—no, sir—until he made this remark: 'You dirty —— —— ——, I will get you yet.'

"Q.—What did you go back to that vacant lot for, if you didn't intend to kill him on that occasion? A.—I don't know, sir. * * *

"Q.—Now, if you had it in your mind and in your intention to let him go, why did you leave the barber shop and go back to that vacant lot? A.—I couldn't tell, sir. * * * Well, I knowed that after that he would kill me if I didn't kill him.

"Q.—But, you were up at the barber shop, two or three and a half blocks away from him; there was no danger of his killing you. * * * A.—Not at the time.

"Q.—Is that the only reason you have to give why you went back to the vacant lot from the barber shop? A.—I didn't have no reasons, only I knowed if I hadn't hit him the first shot, I knowed he would kill me.

"Q.—You knew that if you hadn't hit him with the first shot he was probably alive yet? A.—Yes, sir.

"Q.—And you went back there to kill him? A.—Yes, sir; he has made threats on me before."

Five witnesses for the prosecution testified that when Wickham came back to where Darling was lying on the ground, he put his foot under Darling's head, turned it over and said, "You ——— ——— ——— ———, haven't you got enough yet?" put his gun close to Darling's head and shot him the second time, the shot blowing his brains out. Powder marks were found on the left side of Darling's head, showing that he could not have been looking in the direction of Wickham when the last shot was fired. The interval of time between the first and second shot was from ten to fifteen minutes.

Going back to the request for instructions as to "cooling time," it is not clear from the brief or argument of counsel whether they mean "cooling

time" between the time Wickham made the threats against Darling in Mrs. Erickson's house, or the time between the first and second shots.

In either case, we do not believe that under the evidence in this case, error was committed in refusing the request for an instruction relating to "cooling time."

While there is some conflict in the authorities, the weight of authority and the better doctrine seems to be that "cooling time" is a question of law for the court, and not a question for the jury.

"Ordinarily the sufficiency of the cooling time, and the sufficiency of the provocation, are respectively deemed questions of law, not of fact. But the time required to cool, for example, is sometimes, it is believed with great propriety, submitted to the jury."—2 Bishop's New Criminal Law, § 713.

"It is well settled that the question of cooling time is a question of law to be decided by the court, and not a question for the jury. But if such question is left to the jury, and they decide it as the court should, it will be but harmless error."—Hughes' Criminal Law, § 4.

"The court may, as a matter of law, instruct that the defendant had sufficient cooling time after being provoked to a heat of passion, where the evidence clearly warrants the instruction, and that in such case an unlawful killing would not be reduced to manslaughter."—Hughes' Instructions to Juries, § 254.

Numerous cases are cited by the authorities above quoted, many of which we have examined, and believe that the weight of authority is with the doctrine announced by the text writers above quoted from.

Upon this subject, as a part of instruction 4, given by the court, the jury were told:

"If one actually forms the purpose maliciously to kill a human being, and deliberates and premeditates upon it before performing the act, and then performs it, he is guilty of murder in the first degree, no matter how short the time may have been, if but the time necessary for one thought to follow another, between the purpose and its execution."

The above quoted portion of the instruction is the basis of one of the assignments of error urged.

This instruction is warranted by what this court said in *Van Houton v. People,* 22 Colo. 53, 66.

Under the evidence in this case, there was no error in refusing the instructions requested or the instruction given, above quoted.

6.    The seventeenth instruction related to the law of self-defense.  It is criticised by counsel upon the ground, as they say, that it totally ignores the distinction between an assault committed with felonious intent, and an assault committed with the intention to inflict a beating only.

We do not think the instruction is subject to the criticism made; but, on the contrary, believe that it correctly states the law applicable to the facts of this case.

7.    The eighteenth instruction was:  "You are instructed, that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant was informed that deceased had stated to defendant's wife that the defendant had had or was having improper relations with some other woman, and that thereupon he sought out the deceased and assaulted him only with the intention of giving him a beating, and if you still further believe from the evidence, beyond a reasonable doubt, that the defendant did assault the deceased by beating him and knocking him down, and while so doing was resisted and wounded by the deceased with a knife or in some

other manner, and that then and thereupon the defendant shot and killed the deceased, you should find the defendant guilty as charged in the information, notwithstanding any wounds, however serious, that he may have received at the hands of the deceased.''

The instruction is objected to upon the ground that it took from the jury the consideration of all degrees of murder except the first.

The court had fully, correctly and fairly instructed the jury as to the several degrees of murder and manslaughter, and had instructed them that in arriving at their verdict the instructions were to be considered as a whole. With the exception of this instruction the charge as a whole was without error.

An indictment or information for murder in the first degree includes, also, murder in the second degree and manslaughter, and, as the court had defined the several degrees of murder and manslaughter, the jury could have returned any verdict they believed the evidence justified.

The instruction is faulty and should not have been given.

As an abstract proposition of law, it is entirely indefensible as applied to the evidence in this case; it incorrectly states the facts and cannot be defended as a correct statement of the law applicable to cases upon facts similar to those stated in the instruction.

There is nothing in the evidence to show that the accused sought out the deceased and assaulted him *only with the intention of giving him a beating.* On the contrary, there is abundant evidence to justify the conclusion that it was the deliberate and premeditated intention of the accused to seek the defendant and kill him.

This intention was manifest from the brutal and heartless conduct of the accused from the moment he assaulted the deceased until he blew his brains out, while he was lying in a dying condition upon the ground, and every act of accused showed an abandoned and malignant heart, bent on murder, from the time he left the house in search of his victim until he fired the last shot.

Again, the entire evidence, except that of the accused, showed the deceased was at all times trying to protect himself against the assault of the accused, and, finally, to escape his assailant; that deceased did not cut the accused until after he had been beaten over the head with a gun in the hands of the accused; that thereupon he endeavored to make his escape by flight, and after he had started to run and was at a distance of fifty feet from the accused, he halted, at the command of the accused, and received the first bullet (which was necessarily fatal, according to the testimony of the doctor who performed the autopsy); so that the statement in the instruction to the effect that deceased resisted and wounded the accused at the time of his being knocked down and beaten, was contrary to the evidence in the case.

The language of this court in *Van Houton v. People,* 22 Colo. 53, 66, we think, is peculiarly applicable to the facts shown by the evidence in this case.

"The entire evidence, excepting only that of the accused, negatives the conclusion that this was a case of mutual combat, and thereby excludes the idea of manslaughter. So, also, the plea of self-defense is not within our consideration, and it is negatived by all the evidence except that of the defendant, and was resolved against him by the jury.

"The crime of murder alone remains. This the statute divides into two degrees, *i. e.,* murder of the

first degree and murder of the second degree. Murder being established, the law in its humanity declares it to be murder of the second degree in the absence of circumstances showing it to have been murder of the first degree."

The entire evidence in this case, *including that of the accused,* excludes the idea of manslaughter.

A verdict of manslaughter would have been a gross miscarriage of justice.

The punishment imposed by statute for murder of the second degree is imprisonment in the penitentiary for a term of not less than ten years, and may be extended to life. If the jury had returned a verdict of murder of the second degree, under the testimony in this case, *including that of the accused,* the judge who presided at the trial would have been recreant and remiss in the discharge of his duty, had he failed to have sentenced the accused to the penitentiary for life.

The jury in the exercise of the discretion, mercy and humanity vested in them by the law, by their verdict, sentenced the plaintiff in error to imprisonment in the penitentiary for life, whereas, the evidence in this case, in our judgment, would have warranted the infliction of the death penalty.

When a case is entirely free from doubt and it affirmatively appears that the defendant was not and could not have been prejudiced by error in the instructions, error in the charge is not ground for reversal.—*Mackey v. People,* 2 Colo. 13; *Clare v. People,* 9 Colo. 122, 125.

In *People v. Donahue,* 45 Cal. 321, it is said:

"The rule is that judgments will be reversed for alleged errors in instructions only when, looking at the testimony, we can see that the jury may have been misled by them to the prejudice of the defendant, or when, in the absence of the testimony, it is

apparent that the instructions would be improper under any possible condition of the evidence.''

We believe that the rule announced in the cases last cited is a wholesome one, and should be applied in this case.

There is no pretense that the evidence is not sufficient to sustain the verdict.

Our conclusion is, that while the eighteenth instruction, for the reasons above stated, should not have been given, that the same was without prejudice to the accused.

8. The nineteenth instruction given by the court is assigned as error.

This instruction relates to the second shot fired by the accused, and is objected to upon substantially the same grounds as those urged to instruction number eighteen.

The instruction is not in anywise open to the objections urged against it. It correctly stated the facts as shown by all the evidence in the case, and is a correct statement of the law applicable to such facts.

There being no prejudicial error in the record, the judgment will be affirmed.        *Affirmed.*

Decision *en banc.*

---

Mr. JUSTICE BAILEY and Mr. JUSTICE CASWELL, dissenting:

Mr. JUSTICE BAILEY dissents, for the reason that the eighteenth instruction given by the court to the jury was erroneous in that it took from the jury the consideration of all degrees of murder except the first degree. No matter what the facts and circumstances of the killing were, and even though they pointed conclusively to the guilt of the defendant of murder in the first degree, still the degree of guilt was a question to be determined by the jury, and the court

did not· have the power. or authority to relieve the jury of that duty. The error is not cured by the fact that in other instructions the jury was informed as to the several degrees of murder and man-slaughter. The giving of three correct instructions does not dissipate the evil effect of one incorrect one. Neither the trial court nor this court can determine what influence the eighteenth instruction had upon the minds of the jury. By that instruction the jury was practically told that if it believed the contention made by the defense, it should, nevertheless, find the defendant guilty of murder in the first degree.

Mr. JUSTICE CASWELL joins in the above dissent.