RUSHING *v.* STATE.

Opinion delivered July 7, 1930.

J. H. *Lookadoo,* Millard *Alford* and Robert L. *Rogers,* for appellant.

*Hal L.* Norwood, Attorney General, and Pat *Mehaffy,* Assistant, for appellee.

MEHAFFY, J. The appellant was indicted for the killing of David Hodges. He was charged with murder in the first degree; he was convicted of murder in the second degree and his punishment fixed at imprisonment in the penitentiary for fifteen years. The deceased and the appellant were competitors in the jewelry business in Gurdon, Arkansas, and were not on friendly terms. The appellant was local watch inspector for the Missouri Pacific Railway Company at Gurdon and had been for several years. There was apparently some dissatisfaction among the railroad men, and they wanted the deceased to inspect their watches instead of the appellant. On September 21, 1929, about 10 o'clock at night, the deceased went into the cafe of the Commercial Hotel at Gurdon with Hugh Campbell to get a cup of coffee. While they were in the cafe, the appellant and J. D. McGedee came in and ordered something to eat. It is claimed by the State that when Hodges started out of the cafe appellant shot him. Appellant, however, claims that Hodges was coming towards him with a chair. When the deceased was shot, he ran out of the cafe, and fell after going a short distance. An ambulance was called and Hodges was taken to the hospital in Prescott, but died from the effects of the wound about an hour after reaching the hospital. The physicians and undertaker testified about the wound, describing it and the physicians testified that this caused Hodges' death.

Herschel Kitchens, a locomotive engineer testified in substance that he had known Hodges all his life, went to the cafe on the night of the killing, saw Hodges there. Rushing and some other gentleman were sitting down at the counter, and saw deceased come towards the center of the room and sit down. Appellant was at the far end of the room next to the kitchen. Witness turned to the counter, and after a few seconds something attracted his attention, and he saw Hodges standing with his hand on the back of a chair and saw Rushing shoot. When he looked again Hodges was running; heard Rushing say:

"He got what he had been wanting for a long time." Witness was a little hard of hearing, and they were the only words he heard spoken. Deceased was facing towards Rushing with his left hand on the chair, but did not see his right hand.

The undertaker testified that while deceased was lying on the sidewalk, his father came up and asked what happened. Deceased replied: "He shot me; I was in the cafe for a cup of coffee. Rushing and a tall salesman from St. Louis came in. He was cursing me. When I started out, Rushing said, 'There goes the low down S. of B.' I turned round to look, and he shot me."

Witness Callaway testified in substance that he took his watch one time to appellant to have it repaired, and that appellant kept it some time and returned it in the same condition; he then took it to deceased, who repaired it. This witness testified about a class meeting of the railroad men several months before the killing when they voted to change watch inspectors and give the position to Hodges. It was the duty of appellant to inspect watches for railroad men.

Herman Osborn saw deceased fall to the sidewalk after being shot, and heard him say he was going to die. Deceased said he was in there drinking a cup of coffee and Rushing turned around to the fellow who was with him and said: "There goes the G. D. dirty scab selling watches at $2.50 and $5 profit." He said, "Now look here," and Rushing shook his finger and shot him.

Lester Stewart testified in substance that he saw deceased run by his store hollering and was stopped and said, "Boys, you will never see me alive again. I believe I am going to die. I was in the Commercial Cafe and drank a cup of coffee or sandwich or something and started out." Rushing said, "There goes that crooked S. of B. that sells watches at $1.50 profit." This witness said that deceased said he turned around and said, "Look here, Rushing," and when he did that, Rushing shot him.

R. M. Davidson, a conductor, knew both appellant and deceased, and some months before the killing heard Rushing say "That damned fellow ought to be killed."

Dr. McLain, a witness for defendant, testified in substance that he was called to treat the deceased about ten minutes after the shooting, and deceased's father came up and asked Hodges a question, and Hodges said he had been selling watches at $1 profit, and Rushing did not like it or something like that and he had stood that kind of talk about as long as he could. He testified that Hodges did not say he was going to die; that he made no such statement loud enough for witness to hear.

Dr. Epperson, witness for appellant, testified in substance that he was acquainted with both appellant and deceased. Deceased was a large man weighing something over two hundred pounds. He reached Hodges shortly after he was shot while he was lying on the sidewalk. When deceased's father asked who shot him and what for, he replied: "Because I was selling goods cheaper than he could." Witness said that Rushing did not say, "There goes the G. D. S. of B." while he was there.

Justis Yates testified on behalf of appellant, that he was constable of the township, knew both parties, had a conversation with deceased ten days or two weeks before he was killed. Deceased said he had been advised to let Rushing go so far with his talk and then knock him to the south when he was traveling north.

J. T. Watson testified in substance that he was trainmaster for the Missouri Pacific Railway Company, had been with the railroad company for twenty-five years. Gurdon was formerly his home. Had known appellant and deceased about ten years. Some thirty days before the killing Hodges told witness that he was going to have the job if he had to kill. This was with reference to Hodges trying to get Rushing's place as time-inspector, and he said, "I will kill him," or "if I have to kill him." Witness told Rushing of the threats sometime later. Hodges had been trying to get witness' help to get Rushing's place.

J. W. McDaniels testified in substance that he was night clerk at the Commercial Hotel; had known Hodges all his life, knew Rushing when he saw him. They both ate at the cafe. Was present on the night of the killing. Rushing and another man went into the cafe and sat on the stools near the back end of the lunch counter. The room was about twenty-five feet long. Hodges was sitting down when Rushing came in. Rushing and the man with him gave an order, and the witness went to the kitchen and prepared the order and was returning with it when he saw Hodges advance with a chair and Rushing whirled off the stool and shot him. Hodges carried the chair about half way out of the cafe, set it down and ran; had a plain view of Hodges; he was only about six feet from me when he was shot; did not know how he was handling the chair, either at his side or over his shoulder, could not say which, he was advancing on Rushing; did not know whether he was going slow or running or whether he was in the act of striking when shot, he was facing towards Rushing, had a chair in his hands but not directly in front of him. After the shooting was over, Rushing went back and finished his tomatoes. Witness denied that he talked to Burroughs and Rudolph the next morning, telling them first that he could not see it at all and later that he did see it and denied talking to them at all. Witness did not hear a word spoken before the shooting.

J. D. McGedee was acquainted with Rushing but not with the deceased; walked with Rushing to the hotel; after sitting on stools near the back end of the counter, noticed the man standing in front of the counter next to the cash register. Thought the man was looking at him, and at the same time Rushing was saying something to witness which he did not understand. The man in front put his hand in his pocket, whether it contained change or not witness did not know, but he stood there a few seconds and then ran or walked towards witness and appellant. When he got about half way between witness and

the far end of the counter, he picked up a chair and advanced on witness six or eight feet where he was shot. He was holding the chair up in front in a striking mood; could not hear what he said. Did not hear Rushing or understand anything he said before the shooting.

Appellant testified that he had lived at Gurdon for the past thirteen or fourteen years, was a jeweler and local time inspector for the Missouri Pacific Railway Company at Gurdon for the past six years; had known deceased for eight or nine years; were not considered good friends, but nothing unusual but competitors in business; had heard a good many threats. Deceased was a large man weighing 225 pounds and appellant weighs 114 to 117 pounds; carries a good line of goods and at times has to look out to keep from being robbed, and when he has to carry jewelry from his place of business to his room nearly always goes armed for his own protection; did not go to the hotel to meet deceased nor with any intention whatever of doing him bodily harm or to kill him; went to the hotel with McGedee, and, when their lunch was brought in, something attracted his attention; glanced up and saw Hodges advancing with a chair, coming at a fast stride, saying: "Rushing, I have taken all I want to," or something like that. About that time I jumped up and shot. I was afraid he was going to kill me. I shot to save my own life; did not shoot out of a spirit of revenge; denies that he ever told David Hodges he should be killed or that he would kill him; denied that he had ever made any threats. He thought Hodges was going to kill him, and he started on him with a chair. Hodges was within seven or eight feet when he was shot; could not have stopped Hodges without shooting him; denies that he said anything that he remembers to the salesman; denies that he knew anything about the class meeting or wanting to change inspector.

R. E. Burroughs testified that he knew McDaniels who testified for appellant, and the morning after the shooting McDaniels said he did not see it. Later McDan-

iels said that when he came out of the kitchen Hodges was standing with his hand on the back of a chair, and he heard some one say that Hodges said he was just trying to make an honest living, and Rushing whipped out his gun and shot him. Mr. Rudolph was present when this was said.

Rudolph testified that witness McDaniels talked to him on the morning after the killing and said that he was in the kitchen and did not know how it occurred.

At the time that witness Callaway testified about the class meeting and the resolutions, the prosecuting attorney stated to the court that he would offer evidence showing that Rushing knew about this or connect Rushing with it, but when that proof was not offered and before the case was submitted to the jury, the court withdrew this testimony and told the jury they could not consider it for any purpose. The court had already stated that it could be introduced for one purpose only, and for that purpose on condition that the State showed it was communicated to Rushing.

Appellant first contends that the case should be reversed because witness P. E. Callaway was permitted to testify about a meeting of railroad men and to state what took place at said meeting. The appellant had been watch inspector for the Missouri Pacific at Gurdon for several years, and at the meeting testified about it was decided to give it to Mr. Hodges, the deceased. The evidence did not show that appellant was ever informed of the meeting or what took place there and therefore was not competent to prove motive nor for any purpose. The court stated to the State's attorney, when the testimony was offered, that it must be shown that this information was conveyed to the defendant, and the attorney stated that he would undertake to show the connection. The court then said: ''Now, gentlemen, I will say to the jury this: That that testimony will be admitted for one purpose and one purpose only. I don't know whether it goes to show, or will go to show, that whatever happened at that meeting, the

information or action of the meeting was conveyed to the defendant or not, but the only purpose is to show, if it does show, and that's a question for the jury, whether it raised the animosity or anger of the defendant, and whether or not he was seeking revenge on account of it." The State did not show that appellant received any information about the meeting or what took place there. Afterwards the court said to the jury: "Gentlemen of the jury, on yesterday there was some testimony introduced relative to a meeting of some of the railroad men down at Gurdon in which it was claimed that a resolution was passed to take the watch inspection away from the defendant and give it to the deceased, Hodges. Now, gentlemen, I let that testimony go to the jury for the time, but the court has determined that that is not proper for your consideration. So you will not consider anything—in considering your verdict you will not consider anything with reference to that meeting where that matter was discussed, or anything about it. I am withdrawing that from the jury, and you have no right to consider that at all because it is not proper for your consideration." It was a matter of discretion for the court to permit the prosecuting attorney to proceed with the testimony above mentioned on condition that proof would be subsequently introduced to show that appellant had received information as to the meeting and what took place there. *Housley* v. *State,* 143 Ark. 425, 220 S. W. 460; *Easter* v. *State,* 96 Ark. 629, 132 S. W. 924.

The instruction of the court that the testimony was not proper and that it should not be considered by them cured the error and removed any possible prejudice against the appellant that may have been created in the minds of the jury by such testimony. *Wells* v. *State,* 151 Ark. 221, 235 S. W. 798; *Johnson* v. *State,* 60 Ark. 45, 28 S. W. 792; *Carr* v. *State,* 43 Ark. 99; *Holt* v. *State,* 91 Ark. 576, 121 S. W. 1072; *Pitman* v. *State,* 51 Fla. 94, 41 So. 385, 8 L. R. A. (N. S.) 509; *Wickham* v. *People,* 41 Colo. 345, 93 Pac. 478.

If the connection had been made as the prosecuting attorney told the court it would, the testimony would have been competent. The trial court necessarily has large discretion in the manner and order of admitting testimony, and when it appeared that the meeting and statements there made had not been communicated to appellant, the court withdrew the evidence from the consideration of the jury and instructed them not to consider it. The jury is assumed to be composed of men of intelligence, and they could not have misunderstood the instruction of the court.

The appellant next contends that the court erred in giving instruction No. 14. The objection urged to this instruction is that it does not tell the jury that a reasonable doubt may arise out of the lack of evidence. This instruction, however, is followed by No. 23, which the court gave, and it contains the statement that the doubt may arise out of the lack of evidence. The appellant contends that the court erred in refusing to give certain instructions requested by him, but they were all covered by instructions given by the court. After a careful examination of all the instructions we are of opinion that the court fully and correctly instructed the jury, and the evidence is sufficient to sustain the verdict. The judgment is affirmed.