No. 10,425.

STITT *v.* THE PEOPLE.

Decided October 1, 1923.

Plaintiff in error was convicted of murder.

*Reversed.*

1.   CRIMINAL LAW—*Evidence—Newspaper Clippings.*   The circumstances concerning the offer by the prosecution, and admission in evidence of newspaper clippings, relating to the homicide

for which defendant was upon trial, considered, and the admission of the evidence held error.

2.  WITNESSES—*Impeachment.* Where a witness for the prosecution in a criminal case, testified at three different trials of the same action, and on the last, gave material evidence which he had not mentioned in his former testimony, but gave it as his opinion that he·had so testified, it was error to exclude offered testimony of the official court reporter, that no such testimony had been given by the witness on the first two trials.

3.  CRIMINAL LAW—*Trials—Court Discretion.* The general conduct of trials is so largely in the discretion of the trial court, that only for a clear abuse thereof should a new trial be had. But in a criminal case, where the question of guilt is close, the trial court should be on its guard not to color its rulings, or seem thereby to convey to the jury its own belief of guilt.

*Error to the District Court of Adams County, Hon. Samuel W. Johnson, Judge.*

Mr. RICE W. MEANS, for plaintiff in error.

Mr. VICTOR E. KEYES, Attorney General, Mr. CHARLES R. CONLEE, Assistant, Mr. RUSSELL W. FLEMING, Attorney General, Mr. JOSEPH P. O'CONNELL, Assistant, for the people.

*En banc.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

THE defendant was tried, and, by the jury, found guilty of the murder of Carl Liebers. He was sentenced by the court to life imprisonment in the state penitentiary. The story brought up in this record reads more like an imaginary episode, than an actual occurrence in real life. On September 20, 1920, about 11 o'clock in the forenoon, Carl Liebers, a salesman of silos, was driving his automobile on a public highway near the town of Henderson in Adams county. He was traveling south from Henderson and towards the city of Denver. In the car with him was another man. The highway runs parallel to, and alongside of, the Union Pacific railroad track. At this hour, in a

field adjoining the railroad right of way on the west, and about half a mile south of Henderson, were Ervin Shirat and several other men who were gathering and hauling corn. When Liebers' car was opposite these men, 100 or 150 feet distant, one of the men in the car said, in a loud voice, "Yea," and at the same time a shot was fired. The car kept moving but had not gone far when another shot was fired and smoke from the weapon was seen, and the man on the left-hand side, who had been driving, leaned or fell over the side of the car. This man, who was Liebers, was still in this position when the car came to a stop about one-fourth of a mile from where Shirat was. In a minute or two the car, driven by the other traveler, started up and went on south at a high speed. In a few minutes another automobile, going north, driven by Henry Bishop, a hotel keeper at Henderson, met the Liebers' car going south, a collision between the two vehicles being narrowly averted, and when Bishop reached the place where the Liebers car stopped, he saw Liebers' body in the highway.

He put it into his own car and carried it to his hotel at Henderson, Liebers dying on the way as the result of the gunshot wound.

Efforts to ascertain the identity of the perpetrator of the crime were at once instituted by the sheriff's office of Adams county and the police force of Denver, and diligently continued for many weeks without success, and then abandoned. The newspapers of Denver at the time of the homicide published minute and detailed accounts of it, among other things stating that a designated amount of money and a watch, that Liebers was supposed to have on his person, were missing from the body when it was found by the witness Bishop.

October 28, 1920, a boy giving his name as Raymond Miller, under a sentence by the district court of Lincoln county, was received at the state reformatory at Buena Vista. For some reason not appearing in the record, but probably for some infraction of the prison rules, this boy was kept in solitary confinement in a dark cell. Naturally

this proved irksome and depressing to him. In a conversation with one or more of the inmates he was informed that if, while one was confined in the reformatory, a criminal charge was filed against him in a court, a parole could be secured from the prison authorities so that the accused might be brought to trial under the charge. In January, 1921, this boy told Warden Capp that he was there under an assumed name, that his real name was, not Raymond Miller, but Glenn Stitt, and that his mother and two sisters lived in Denver. In February he told Joe Brown, a trusty, whom he designates as a "snitch" who would disclose everything to the prison officials that was told to him—and defendant told him with the desire and expectation that the trusty would pass it on to the authorities— that he had killed a man on the Brighton road and he could not sleep. The trusty told Curtis, the deputy warden, and Curtis took the defendant to Warden Capp's home on the reformatory grounds, and in their presence defendant related the following story, the narration of which he has never denied.

Liebers picked up the defendant Stitt for a ride, somewhere on what is called in the record the Brighton road, between the city of Denver and the town of Brighton. The defendant had a revolver with him. He held up Liebers with his weapon, took from him about $20.00 in money and tried to take his watch. Liebers did not hesitate when he handed over the money, but resisted when the defendant tried to take the watch. The defendant then shot Liebers, took his watch and kicked him out of the automobile and drove on, in a roundabout way to Ft. Lupton, thence to Hudson, where he bought five or six gallons of gasoline, then drove east across the sand hills intending to go to Kansas City, encountered difficulties, got discouraged, gave up the contemplated journey, and drove back through Aurora to the city of Denver, on the drive, and near Aurora, threw away the watch and left Liebers' car in an alley back of a garage in the city of Denver, then got employment, worked for four or five days on a farm

in the vicinity of Hudson near the place of the homicide, then went to Kansas City, and on the way back to Colorado, he and another boy burglarized a store in Logan county, was tried for the offense, and sentenced to the state reformatory. Other details of the story are omitted here because not material upon the questions discussed in the opinion and upon which our decision is based. Some other details that are pertinent will be found in the appropriate place in the opinion.

The warden was skeptical at the time he first heard this story and he repeatedly said to the defendant: "You are stringing me" and suggested that the tale was imaginary. Because of his doubts the warden requested Mr. Moynihan, President of the State Board of Corrections, and a lawyer, to examine the defendant, which Moynihan did, and the boy without hesitation repeated the story substantially as he had previously told it to the warden. He refused, however, to sign a written statement prepared by Mr. Moynihan. To the district attorney and the sheriff of Adams county, who went to the reformatory at Buena Vista in response to information given by the warden, the defendant refused to make any statement, except to say, in response to a question by some one present at the interview, that the story he had told the warden and Moynihan was true. The defendant, upon the suggestion, readily consented to, and did, go with the warden and other persons to the scene of the homicide to point out the spot on the public highway where the homicide took place, and to drive with them over the route traveled on the same day after he drove away from the place where Liebers' body was discovered. The object the warden had in view was to satisfy himself of the truth or falsehood of the defendant's story concerning which, as it appears from his entire testimony, he remained in doubt.

The place which the defendant designated as the scene of the homicide was not the place, or in the same highway, where the two witnesses of the People, Shirat and Bishop, testified that the body of Liebers was found. The place

where the defendant thought he had thrown away the watch was thoroughly searched by the warden's party but the watch was not found. The place where the defendant said he left Liebers' car in the city of Denver was not the place where it was found a day or two after the homicide. Indeed, it is admitted by the officers that this investigation and inspection did not tend to prove the truth of, or to corroborate, the defendant's confession. On the contrary, its tendency was to negative its truth, and during the drive the warden again repeated his suggestion to the defendant that the source of his story of the crime was his own imagination. Nevertheless, an information was filed by the district attorney in the district court of Adams county on June 7, 1921, charging Stitt with the murder of Liebers. His trial began June 13. The jury disagreed and was discharged. A second trial was begun in the following September and this jury disagreed. The third trial, which is the subject of this review, was had in February, 1922, and the verdict was guilty.

The parties seem to be in accord that the evidence was substantially the same at each trial. That Liebers was murdered is not in dispute. Whether the defendant is the guilty party is a grave question. That two juries were unable to agree is some indication that the question of his guilt is a close one. Defendant's counsel vigorously contends that the evidence is legally insufficient to sustain the verdict. Were it not that serious prejudicial errors, committed by the trial court during the progress of the trial, of themselves require a reversal of the judgment, this challenge would meet our careful consideration. We have carefully read and considered, not only the evidence abstracted by defendant's counsel, but the entire evidence as reproduced in the transcript of the record. Though, as just stated, and for the reasons already given, we do not pass upon its sufficiency, our examination of it has impressed us with the necessity of carefully scrutinizing the rulings of the court assigned as error and complained of, to see if they are objectionable, and, if they are, whether, in any measure, they, or any of them, contributed to the verdict.

The foregoing statement, supplemented by the printed briefs, indicate the nature of the defense relied on. The defense was a plea of not guilty, and an alibi, which the parties treat as included in the plea. The defendant admits that he confessed the crime to Warden Capp and to other persons. His testimony in effect is that the confession, though made, is not true, and his counsel contends, as the law declares, that upon the trial he had the right to overthrow it. Defendant's purpose in making his confession he says was that, after he was informed, and was so led to believe, by thus disclosing it, a criminal charge would be, as he hoped, preferred against him which would accomplish his release from the reformatory to attend the trial of the charge, against which he could successfully defend by showing that at no time of the day on which the crime was committed was he present in Adams county, but was all of that day in his mother's home in the city of Denver. A number of witnesses so testified in his behalf, and, if their testimony is true, a perfect alibi was established. We are not, however, now concerned with the probability or improbability of this defense, or the weight and sufficiency of the evidence in its support. It impressed some of the members of two different juries. It is not to be lightly ignored, regarded as beyond belief, or summarily dismissed as a trumped-up defense. The defendant had a constitutional right to present it to the jury before an impartial judge in a trial attended by the safeguards which the law throws around every person accused of crime. We are thoroughly convinced that the defendant did not have a fair trial, that prejudicial errors were committed, which, if not controlling, materially contributed to the verdict, which otherwise might have been different. These errors are now considered.

Not all of these questions have been preserved by the defendant for review in the way which our rules and procedure prescribe. The attorney general in his brief has pertinently said that, in the state of the record, it is difficult to arrange his argument in a logical manner. He

might also have insisted—though, as a conscientious offi-
cer, mindful of his duty to the defendant as well as to the
People he has not done so—that the defects in the record,
more or less technical, are such that the defendant might
not be entitled to be heard at all. In the interests of jus-
tice, however, even if the prosecution had interposed the
objection, we would not be inclined to allow the defendant's
remissness in this respect to operate as a bar to a hearing
in this Court upon substantial questions affecting his con-
stitutional rights.

1. The prosecution, in making out its case in chief,
sought, in its opening, to anticipate and destroy the defense
which it assumed the defendant would interpose. To this
end it offered in evidence, and, over the defendant's objec-
tion upon available and pertinent grounds, the court ad-
mitted, newspaper clippings from the Denver Post, News,
and Times of the issue of September 21, containing de-
tailed accounts of the homicide and comments of the
writers thereon. The prosecution claimed that these clip-
pings tended to negative the truth of the defendant's claim
that his story of the crime was based upon articles which
he had read in the newspapers; that is, the story as told
by defendant to the various witnesses was contrary to the
story as told by the writers of these articles. The court,
in the presence of the jury, said that, inasmuch as the de-
fendant's counsel in his opening statement to the jury said
defendant's admissions or confession originated in his own
mind from newspaper articles, and as there was testimony
that the defendant said he had read articles in the news-
papers, these clippings offered would be, and they were,
admitted, not for the purpose of establishing as facts their
contents, "but for the purpose of showing whether or not
the story of the defendant, which it is claimed he made,
could have originated in any other way than from his own
personal knowledge. * * * The State has a right then
to show that the story which he told the witnesses, if he
did tell them a story, is such that it could not have orig-
inated from any articles which he read in the newspapers.

That is the ground upon which the Court admits it, not in anticipation of what his defense is, because even if counsel stated that that was his defense, he would not be bound by your statements." In one of its instructions the court embodied this statement of the law.

Not stopping to suggest other objections to this ruling, it is clear that it was error for the following reasons: There was no showing by the prosecution, or offer to show, that these clippings were the original or the same as the ones defendant read, or that only such articles were published. No proper identification was made, no tying up of the articles read by defendant with those admitted by the court. There are other Denver newspapers than the three mentioned. It might well be that the defendant had read other articles in these three and other journals upon which the story of his confession was based. Besides, it was the theory of the defense that the defendant, having at one time lived in Adams county, was familiar with that country and with the route alleged to have been taken by him after the shooting, and that his story was based not only upon newspaper articles, but, in part, upon his personal knowledge thus acquired, and from what he heard and saw during the four or five days he worked in that vicinity after the homicide.

2. Warden Capp, the principal witness for the prosecution, testified that when, on the drive in Adams county, the investigating party arrived at the place in the highway where Liebers' body was actually found, he so informed the defendant Stitt, who then breathed hard and was worried or nervous. Defendant's counsel, on cross-examination, as laying the ground for impeachment, asked this witness if at the former trials, or either of them, he testified or referred to this incident. The witness was uncertain but gave it as his opinion that he did so testify. Later in the course of the trial defendant's counsel called the stenographer or official reporter who took all the testimony at both of the former trials. He offered to prove by him, and the offer was made in the proper way, that no such

testimony was given by the witness Capp at either trial. The stenographer had his original notes with him and testified that he had read the entire testimony of Capp, both that in chief and upon cross-examination. The court refused to allow him to testify in answer to the inquiry of defendant's counsel, or to read his notes on Capp's entire examination on this subject, but sustained the objection of the district attorney. Manifestly this was wrong. It needs no argument to show that, if the defendant did breathe heavily and was worried or nervous when the place of the homicide was pointed out to him, the prosecution might have used, and probably did use, this damaging testimony of Capp with telling effect on the jury. The defendant was entitled to have before the jury the fact, if it be a fact, which he offered to prove, that at the previous trials Capp omitted this very important circumstance when he was asked to testify to all the incidents and circumstances that occurred during this drive with the defendant. For this reason alone the defendant is entitled to a new trial.

3. The trial court unduly restricted defendant's counsel in his cross-examination of the people's witnesses. He was not permitted to show, particularly in the cross-examination of the witness Capp, the circumstances by which the defendant, at the time of the confession, was surrounded, his confinement in a dark cell, or as to his state of mind as the result of solitary confinement, or that it was because of his doubt of the defendant's connection with the crime that he requested President Moynihan to examine him. In other particulars rulings against the defendant were in marked contrast to those of similar character which were made in favor of the people. We do not refer to these specific rulings, and the record contains others that might be mentioned, or to the general conduct and supervision of the trial by the presiding judge because they require a new trial. This Court has decided, and Dean Wigmore, and the authors below cited, have collected and commented upon many decisions holding that cross-examination of

witnesses, recalling witnesses for recross-examination, even to lay ground of impeachment, order of proof, anticipating the defense, and the general conduct of the trial are so largely in the discretion of the trial court that only for clear abuse thereof should a new trial be had. 1 Thompson on Trials, 2d ed., Chap. 14, p. 351; 38 Cyc. p. 1349, *et seq.;* 2 Wigmore on Evidence, 2d. ed. Sec. 944; *Beach v. Schroeder,* 47 Colo. 312, 107 Pac. 271; *Plummer v. Struby-Estabrooke Co.,* 23 Colo. 190, 47 Pac. 294; *Mouat v. Hildebrand,* 15 Colo. 382, 24 Pac. 1042; *Gray v. Sharp,* 17 Colo. App. 139, 142, 67 Pac. 351; *Union Pac. D. & G. Ry. Co. v. Perkins,* 7 Colo. App. 184, 42 Pac. 1047.

Some of these rulings, to say the least, go to the very limit of, if they do not actually exceed, the court's discretion. Our object, however, in the foregoing reference is primarily for another purpose. The record indicates that the judge, who presided at the two former trials, had reached the conclusion that defendant was guilty and, therefore, considered it his duty to assist the prosecutor in securing a conviction, not only to end the litigation, but to vindicate the law. This may explain why some of the rulings against the defendant were in such marked contrast to rulings, on similar questions, in favor of the prosecution. Where the question of guilt was so close, as in this case, and where there was no evidence of guilt, except defendant's confession, which he repudiated, it is necessary for the trial court to be on its guard not to color its rulings, or seem thereby to convey to the jury its own belief of guilt.

The judgment is reversed and the cause remanded.

MR. JUSTICE ALLEN not participating.