POWER v. PEOPLE OF THE STATE OF COLORADO.

1. CHANGE OF VENUE—DISCRETION OF TRIAL COURTS.—In passing upon an application for a change of venue on the ground of prejudice of the inhabitants, the trial court should exercise a sound discretion; it is only in case of manifest abuse of such discretion that its decision will be reversed by this court.

2. CROSS-EXAMINATION—EXTENT OF.—The extent to which the cross-examination of a witness may be carried in any particular matter may be controlled by the court within reasonable limits.

A witness for the prosecution, upon cross-examination, was asked if he had not participated in a movement to take the defendant out of jail to hang him. On objection by the state (not by the witness); *held*, that the question was proper for the purpose of affecting the credit of the witness; but that as the testimony of the witness was

afterwards fully corroborated by the defendant himself, the ruling. of the court sustaining the objection was altogether harmless.

3. PROOF OF FACT AND DATE OF DEATH.—Where on a trial for murder the death of the party charged to have been murdered was positively proved to have occurred before the trial, but the precise date of such death was not testified to; *held*, that the jury, from the particular circumstances proved before them, were warranted in finding that the death occurred before the return of the indictment.

4. DELIBERATION AND PREMEDITATION, HOW ESTABLISHED.—Where an indictment for murder charged that the killing was perpetrated by willful, deliberate and premeditated shooting; *held*, *First*, that to justify a conviction of murder of the first degree the evidence must establish beyond a reasonable doubt that the killing was willful, deliberate and premeditated, as well as with malice aforethought; *Second*, that the taking of human life by the use of a deadly weapon does not necessarily justify the inference that the killing was either willful, deliberate or premeditated; but that such inference may be warranted from the use of a deadly weapon under certain circumstances; *Third*, that the question whether or not the killing was willful, deliberate and premeditated as well as with malice aforethought, was properly left by the charge of the court to the determination of the jury under all the circumstances of the case.

*Error to District Court of Montrose County.*

THE plaintiff in error, Mark Power, defendant below, was indicted and convicted of murder of the first degree at the October term, 1890, of the district court of Montrose county. Upon application to this court a writ of error operating as a *supersedeas* was allowed for the purpose of reviewing the record of the cause.

Mr. THOMAS J. BLACK, Mr. JAMES B. BELFORD and Mr. S. H. BAKER, for plaintiff in error.

Mr. J. H. MAUPIN, attorney general, and Mr. H. B. BABB, for defendant in error.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

The assignments of error will be considered as presented. in the briefs of counsel.

1. The refusal of defendant's application for a change of venue is assigned for error.

The defendant applied for a change of venue, alleging that the inhabitants of Montrose county were prejudiced against him. His petition was duly verified and supported by affidavits. Counter-affidavits were also filed on behalf of the people controverting the matters alleged in defendant's petition and affidavits. This procedure was in accordance with the act of April 10, 1885, Session Laws, p. 385.

Section 4 of the act of 1885, *supra*, provides that an application for a change of venue on the ground of prejudice of the inhabitants shall be granted or refused by the court or judge upon the consideration of the petition and all the affidavits. In many cases the trial court will have advantages, not possessed by a court of review, for determining the necessity or propriety of granting a change of venue upon such ground, and the court should exercise a sound discretion in passing upon such an application. It is only in case of a manifest abuse of such discretion that its decision will be reversed by this court. *State v. Billings*, 77 Ia. 417.

The affidavits filed in behalf of the defendant showed that certain newspapers of general circulation in Montrose county had denounced the defendant as guilty of murder in severe terms; that in consequence of such publications the inhabitants of the county had become prejudiced against the defendant and had assembled in large numbers near the jail for the purpose of doing violence to him shortly after the homicide; and that such demonstrations of violence had received the countenance and approval of some of the leading citizens and certain officials of the county.

In behalf of the people, however, it was shown by affidavits that only the inhabitants of a certain part of the county had been prejudiced against the defendant, and that from other parts an unprejudiced jury might be obtained. It was further shown that one newspaper, at least, published in the county, had published a guarded account of the homicide, and had deprecated any resort to violence against the

accused, asking in temperate and commendable language
for a suspension of judgment until the testimony should be
heard, and concluding with remarks, such as : " Every man
should have a fair trial "—" Sensible people will withhold
judgment until they learn the facts in the case."

Undoubtedly, newspaper articles containing criminal ac-
cusations produce considerable effect upon public opinion
and thus occasion much difficulty in securing impartial
jurors ; but as a rule, citizens who are fit to try criminal
cases will not allow previous opinions based upon unofficial
reports to control their judgment against the sworn evidence
in a case.   This is the theory of our laws at the present time.
2 Mills' Ann. Stats., sec. 2592.   The duty is devolved upon
the trial judge to determine whether or not a person who
has formed an opinion concerning the guilt or innocence of
the accused is qualified to serve as a juror.   See *Babcock v.
The People*, 13 Colo. 515, and cases there cited.

If a publication be too violent or denunciatory it is not
likely to have as much influence upon thoughtful minds as
a more temperate article.   Intelligent citizens understand
that verdicts should be based upon opinions formed only
upon sworn evidence given by reliable witnesses—evidence
which has stood the test of cross-examination, and, perhaps,
adverse testimony—and not upon *ex parte* statements.   In
this case we cannot say that the court erred in denying the
application for a change of venue.

2. It is assigned for error that the court refused to allow
certain witnesses for the prosecution on cross-examination
to answer questions concerning their connection with a
mob.

The witness Brown was asked if he did not go to Mont-
rose with a view to help men take defendant out of the jail
and hang him.   An objection to this question by the state's
attorney was sustained by the court, and the ruling was
excepted to.   The question not being objected to by the de-
fendant himself, was proper at the time it was asked for the
purpose of testing the *animus* of the witness and thus affect-

ing, if possible, his credit with the jury.   1 Greenleaf's Evidence, sec. 450 ; 1 Wharton's Evidence, 532 *et seq.*   But the witness Brown did not testify to the shooting nor to any part of the *res gestæ.*   His testimony related wholly to troubles between Baer and the Power family about an irrigating ditch previous to the shooting.   The purpose of such testimony was to show that there had been a quarrel between the parties from which the malice of the defendant might be inferred.   That there had been such a quarrel was not denied by any witness.   Both Powers and his sister testified to its existence ; their testimony showed even greater animosity than the testimony of Brown indicated.   It follows from this that there was no real occasion to attack Brown's credibility since the truth of all that was material in his testimony was established by defendant's evidence.   The ruling of the court was, therefore, altogether harmless.

Similar questions were asked the witness Johnson on cross-examination.   In response Johnson testified that the defendant Power was a perfect stranger to him ; that he had no more feeling against Power than he had against any other stranger ; that he had not taken any interest in working up any feeling against the defendant ; that he had not counseled taking the matter out of the hands of the courts ; that he had not knowingly been with a number of men that came to Montrose for the purpose of taking defendant out of jail, though he admitted that he might have been with men who were there for that purpose.   Further cross-examination upon this point was refused by the court.   Considering the discretion, necessarily vested in trial courts in respect to the examination of witnesses, we cannot say that the refusal was error.   Opportunity for cross-examination upon every proper subject must, of course, be allowed ; but the extent to which such examination may be carried in any particular manner may be controlled within reasonable limits.   In this case, the witness appears to have answered in a straightforward manner, and the examination was carried far enough to lay the foundation for the impeaching testimony which was sub-

sequently offered and permitted without objection. Thus full opportunity was given to show the *animus* of the witness. Johnson did not testify to seeing the shooting; he testified that he reached Baer while he was lying by the ditch, and examined his person and clothing and found no arms upon him. In this Johnson was corroborated by Mrs. Singledecker who was first to reach the wounded man and who saw the examination made. There was no testimony that Baer had any fire-arms upon or about his person after the shooting.

3. It is assigned for error that " the evidence did not establish the death of Charles A. Baer; " and it is urged in argument that the evidence does not show the date when his death occurred.

The evidence shows that on July 2, 1890, late in the afternoon, Mr. and Mrs. Singledecker heard the report of a gun at a distance of 135 steps from their home in Montrose county, Colorado, and hastening to the spot found Mr. Baer wounded in the right leg and in an unconscious condition.

Mr. McLain, a physician and surgeon, who was called to attend Mr. Baer a few hours after the shooting, testified that he found a large gun-shot wound in Baer's right thigh caused by a large bullet ranging upward, coming out back, and doing great damage; that there was no pulse in the wrist; that he gave the patient some stimulus to revive him; that upon examination he found large quantities of black blood coming from the wound, and that upon pressing upon the leg greenish blood would come out; that after giving the stimulus the patient began to throw himself around and complain of distress in his stomach; that one eighth of a grain of morphine was administered; and shortly after that the patient became unconscious.

The doctor further testified that from the nature of the wound he had no doubt but that it was the bullet wound that caused the death of Baer; that he made a *post mortem* examination and satisfied himself that the bullet was the cause of the man's death. The doctor further testified: I

found the large femoral vein cut right off ; about three fourths of an inch of the femoral vein was carried away. The remote cause of death was loss of blood, but the immediate cause while I was at his bedside was shock of his nervous system. The remedies which I gave Baer did not cause his death. They did no harm. The foregoing testimony was uncontradicted.

The precise date on which Baer died is not stated ; but the date of the shooting and the time of the physician's attendance is stated as the evening of July 2, 1890. The testimony indicates that the doctor visited Baer only once; and the doctor states positively that the death occured while he was at the bedside of the wounded man.

The indicment was returned October 28, 1890, and the trial was entered upon within a few days thereafter. The court expressly charged the jury that to warrant a verdict of guilty they must be. satisfied from the evidence beyond a reasonable doubt that the death of Baer occurred before October 28, 1890. Under such evidence and circumstances we cannot say that the jury were not warranted in finding that the death of Baer was occasioned by the shooting, and that it occurred before the indictment was returned.

4. The action of the court in the giving and refusing of instructions to the jury is complained of. This necessitates a further statement of the circumstances connected with the homicide as shown by the evidence.

It appears that the defendant Power and his sister had been involved in a controversy with Baer and others about an irrigating ditch. The ditch had been constructed by Baer and others some years before ; and Baer claimed the right to occupy, use and maintain the same. Power claimed that the ditch interfered with his premises ; Miss Power, it was said, had demanded certain water rights in the ditch which Baer had refused to concede ; and thus the controversy had continued for several seasons. Baer in the meantime had maintained his occupancy of the ditch, and the Powers were very much dissatisfied.

One witness testified that a few weeks before the homicide, Power said that " he would settle the ditch controversy with Baer ; and would take a rifle and shoot him." Another witness, also, testified to threats made by Power a week or ten days before the homicide to the effect, that Power said he was going to have the ditch taken out of the ranch, and when told by the witness that he didn't believe he could do it, that Power said : " Somebody will get hurt," though he did not name the person.

On the day of the homicide Power was out hunting with his rifle. His oldest child, a girl about ten or twelve years of age, was with him. Between four and five o'clock in the afternoon they came near where Baer was at work in the ditch. Power sent his daughter home, and then approached Baer, and at a short distance, perhaps forty steps, shot Baer with his rifle, inflicting the fatal wound, as heretofore stated. The witness Kruger testified to seeing the shooting from a distance of about eighty rods, more or less. He said his view was clear, that Power " walked up close to Baer and shot off the gun, and that Baer fell like being struck by lightning ; " that Baer didn't move toward Power." When the Singledeckers, who lived a short distance away, arrived upon the scene Power was holding his gun from which, as they testified, the smoke was still issuing ; they also testified that they heard the defendant say to Baer with an oath, " Now, you will stay out of here," or, " You will keep out of here now." Power himself testified that he shot Baer then and there, but said that he did so because Baer drew a pistol upon him, and that he shot intending to break Baer's arm, not to kill him.

On the evening of the day of the homicide, Power went to Mr. Muller, a neighboring justice of the peace, and surrendered himself. Muller testified that Power said that he had shot Baer; that he had twice ordered Baer to get off the ranch and that Baer had twice refused, and so he shot him ; that Power said he did not know whether he had killed Baer or not, that he " didn't go near him." Muller testified

positively that Power said nothing about Baer drawing a pistol when he shot him ; and further that Power did not say that he did not shoot to kill Baer.   Power testified that when Muller asked him what he shot Baer for, that he (Power) replied : "It was either kill or get killed."

Under such evidence the important question to be determined on the trial was the nature of the homicide, whether justifiable or unlawful, and if unlawful, the degree of the offense.

The court charged the jury that the mere fact that Baer may have wrongfully or otherwise attempted to operate a ditch through defendant's or his sister's ranch, would not justify the defendant in taking Baer's life.  The instruction was proper.   Human blood is more precious than water, even in this thirsty land.   The testimony was undisputed that Baer had helped to construct the ditch and had been in the possession thereof for several years.   If his possession or his use of the ditch was wrongful the defendant should have resorted to the courts and not to personal violence for the protection of his rights or the redress of his grievances.

The instructions relating to the law of self-defense or justifiable homicide, manslaughter, and murder of the second degree, are not complained of.   But it is insisted that the following sentence in one of the instructions given is erroneous: "If a man wrongfully does an act unlawful in itself and it produces the harm intended, the law conclusively infers the criminal intent."   This sentence was doubtless formulated in some haste during the closing hours of the trial; and yet it would be difficult to show that it is not correct in substance as an abstract legal proposition.   Certainly, when a person wrongfully does an unlawful act intending to produce harm, his unlawful intent cannot be disputed.   So, if a person wrongfully does an unlawful act intending thereby to commit crime, the inference of his criminal intent may be said to be conclusively established.   These propositions are axiomatic.   The sentence above stated, considered in con-

nection with the other parts of the charge, was neither erroneous nor misleading.

It is conceded that *malice aforethought* may be inferred from the use of a deadly weapon; and that thus a conviction of murder of the second degree may be warranted. But it is urged that a conviction of murder of the first degree cannot properly rest upon such an inference. It is true, that to justify a conviction of murder of the first degree in a case like the one under consideration, the evidence must establish beyond a reasonable doubt that the killing was willful, deliberate and premeditated. It is true, also, that the taking of human life by the use of a deadly weapon does not *necessarily* justify the inference that the killing was either willful, deliberate, or premeditated. But that such inference *may* be warranted from the use of a deadly weapon under certain circumstances, cannot be successfully controverted. See the case of *Hill v. The Commonwealth,* 2 Grattan (Va.), especially the reasoning and illustration by Mr. Justice Duncan at pages 599 and 600; also, the case of *State v. McDonnell,* 32 Vt., particularly the remarks of Chief Justice Redfield at page 539.

This subject has also received due consideration in this jurisdiction. See opinion in the case of *Hill v. The People,* 1 Colo., particularly at page 448, where Chief Justice Hallett, referring to a statute similar to the one now under consideration, makes the following lucid observations:

" The statute has not declared that homicide, effected by means of a deadly weapon, shall be punished with death, but deliberate or premeditated homicide is so punishable; therefore, the ultimate point which the evidence must extend to and establish, is not the use of a deadly weapon, but the deliberation or premeditation with which the fatal act is done, and whether the intention is shown by evidence of antecedent menaces, former grudges, lying in wait, the means employed to effect the homicide, or any other circumstances which may give assurance of it. I think that it is to be sub-

mitted to the jury to find the fact under the direction of the law."

It is difficult to conceive of a homicide perpetrated by the use of a deadly weapon wherein the bare isolated fact that the accused took the life of the deceased is known, but in which no other fact or circumstance connected with the killing appears. In this case, certainly, pertinent evidence—direct and circumstantial—was not wanting bearing upon the nature of the killing, and tending to show the deliberation and premeditation of the defendant as well as his motive and intent in committing the act. But the court did not instruct the jury that they should presume that defendant acted with deliberation or premeditation from the mere fact that he took the life of Baer by the use of a deadly weapon or from any other fact or circumstance. On the contrary, the charge of the court directed the attention of the jury, not only to the use of the deadly weapon by the defendant, but to the ditch difficulty, and what transpired at the time of the shooting and subsequently, and all the surrounding circumstances, for the purpose of enabling them to determine the question of the defendant's alleged intent, malice, deliberation, premeditation, and the condition of his mind at the time of the shooting, to the end that they might thereby determine the degree of his guilt, should they find him guilty. None of these circumstances were stated or referred to as conclusive of the defendant's guilt, much less as conclusive of the degree of his crime.

In addition to the foregoing, the court having given the several statutory definitions of the different kinds of homicide, charged the jury to the effect, that if they believed from the evidence beyond a reasonable doubt that the killing was done willfully, with deliberation, premeditation and malice aforethought at the time and place specified in the indictment, they should find the defendant guilty of murder of the first degree; but that if the killing was then and there done by the defendant willfully and with malice aforethought, but

*without deliberation and premeditation*, the verdict should be murder of the second degree.

Thus it appears that the instructions were not only free from any substantial error, but they were full, fair, clear, and explicit. It was not error to refuse the further instructions prayed by defendant, inasmuch as they had already been given in substance and in as favorable terms as the law requires.

5. It is assigned for error that the verdict is against the law and the evidence, but nothing has been urged in argument in support of such assignments. From the evidence already disclosed in this opinion, and from a careful examination of the residue as preserved by the bill of exceptions, we do not feel at liberty to disturb the verdict, either upon the law as announced by the court, or upon the evidence as given by the witnesses. The judgment of the district court must accordingly be affirmed and an order will be entered of record designating the calendar week commencing February twenty-first, A. D. 1892, as the week for carrying the judgment of said court into effect as the statute provides.

*Affirmed.*