MASSIE *v.* THE PEOPLE.

Decided July 5, 1927.   Rehearing denied July 22, 1927.

Plaintiff in error was convicted of murder.

*Affirmed.*

1. CRIMINAL LAW—*Appeal and Error—Sufficiency of Evidence.* In the trial of a homicide case, death from arsenical poison, motive and opportunity, held sufficiently established by the evidence.

2.  EVIDENCE—*Admissibility.* Objection to the introduction of evidence concerning a written record of a telephone call held waived, where the objecting party subsequently introduced similar evidence, and where no objection was made to the exhibit itself.

3.  CRIMINAL LAW—*Evidence.* In the trial of a homicide case, evidence of statements of the deceased indicating a tendency to commit suicide, held inadmissible.

4.  APPEAL AND ERROR—*Admissibility of Evidence.* It is the general rule that the exclusion of evidence will be reviewed only when a pertinent question has been asked, and on objection made, a definite offer to prove presented, which will fully apprise the trial court of the character of the expected evidence and its admissibility.

5.  CRIMINAL LAW—*Homicide—Defense of Suicide—Instructions.* In a homicide case, if the defense of suicide by deceased be interposed and unsupported by substantial evidence, resting merely upon a remote inference, it is sufficiently presented to the jury if within the general instructions.

6.  *Homicide—Poison—Examination of Viscera.* In a homicide case where death was charged to have been by poison, allowance of defendant's motion for inspection and examination of the viscera and internal organs of deceased, held discretionary with the trial court, reviewable only for gross abuse which did not appear in the instant case.

7.  WITNESSES—*Cross Examination.* Proper control of the methods of cross examination is necessarily vested in the discretion of the trial court.

8.  CRIMINAL LAW—*Argument of District Attorney.* On the trial of a homicide case, prosecutor's reference to a witness as defendant's "paramour," his "picking her up," and characterization of defendant as a "despicable coward," and an "out and out hypocrite," in his argument to the jury, held justified by the evidence.

9.  *Homicide—Newspaper Articles.* In a homicide case, the publication of newspaper articles bearing on defendant's guilt, held error, but under the particular circumstances not reviewable or prejudicial.

10. *Homicide—Newspaper Articles.* Defendant in a homicide case is entitled to have the publication of damaging statements in newspapers stopped, and the prosecutor called to account if responsible for them.

*Error to the District Court of Adams County, Hon. Samuel W. Johnson, Judge.*

Mr. CARL CLINE, Mr. BRYAN L. WHITEHEAD, Mr. F. F. HUNTER, for plaintiff in error.

Mr. WILLIAM L. BOATRIGHT, Attorney General, MR. JEAN S. BREITENSTEIN, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, hereinafter referred to as defendant, and one Mrs. Rene Divelbess, were jointly charged, by an information filed in the district court of Jefferson county, with the murder of Katie Massie, defendant's wife. Motions of Mrs. Divelbess for a separate trial, and defendant for a change of venue, were sustained. This cause was thereupon transferred to the district court of Adams county and there tried, beginning May 10, 1926. The jury found defendant guilty in the first degree and fixed the penalty at life imprisonment. His motion for a new trial having been overruled he was sentenced on the verdict. To review that judgment he prosecutes this writ. Defendant's reply brief was filed here May 2, 1927, and the cause was orally argued two weeks later.

The Massies lived at Lakewood in Jefferson county. Defendant (a prohibition enforcement officer) and Mrs. Divelbess had long maintained illicit relations which continued to the time of their arrest. On Sunday, January 31, 1926, Massie and his wife, accompanied by a friend and his wife, went on a pleasure jaunt and returned to their home about 2 p. m. Whiskey was procured, the men drank, all dined at 3 p. m., and defendant, on pretense of business and over the protest of his wife, left at 4 p. m. Thereupon Mrs. Massie and the others attended a theater in Denver, returned home, dined and drank whiskey, and the friends left at 11:30 p. m. Upon his departure that afternoon defendant repaired to the

room of his mistress in a Denver hotel where together they drank whiskey, then dined out and parted at 11 p. m. The only oral evidence of pertinent events from that hour until late afternoon the following day comes from the lips of defendant. He says he reached home about midnight, found his wife in bed apparently drunk, took a drink himself, fired the furnace, threw into it an empty whiskey bottle, and went to bed with his wife. About 4 p. m. on Monday Mrs. Divelbess, in response to a telephone call, went to the Massie home. There she found defendant apparently very ill, lying in bed beside his dead wife. She called a doctor and later a nurse was summoned. Sufficient fire was found in the furnace to last for two hours and on top of it lay an uncorked whiskey bottle. The nurse and Mrs. Divelbess cared for defendant until Wednesday. The body of Mrs. Massie was taken to a Denver mortuary and later, accompanied by defendant, to her old home at Carthage, Illinois, where it was interred February 7. When defendant departed for Carthage he left Mrs. Divelbess in charge of his home, first having made the necessary arrangements, by cash and credit, for her maintenance and support there. He returned in a few days and took up his abode with her. Suspicions of his wife's relatives had been aroused by certain conduct of defendant while he was in Illinois and certain rumors from this state which reached them there and as a result they employed a detective agency to make investigations. A report of its activity having reached defendant, he hired detectives of his own to watch the others. This soon brought Colorado officers into the investigation and resulted in the disinterment of deceased's body and an autopsy at Carthage early in March. This autopsy disclosed that Mrs. Massie had not died of a cerebral hemorrhage as had been certified by the physician called on February 1. Portions of the viscera of deceased were brought to Denver and an examination thereof indicated death by arsenical poison. The arrests and this trial followed.

Of the 147 assignments of error those argued by defendant's counsel are presented under eleven subheads. Of these the only questions requiring our consideration may be thus grouped: (1) The sufficiency of the evidence. (2) The admission of Exhibit Q. (3) The alleged erroneous exclusion of the defense of suicide. (4) The refusal of the court to permit a further and independent examination by the defense of the viscera. (5) The alleged prejudicial conduct of counsel for the people.

1. The evidence in this case was circumstantial. There are approximately 2,500 folios of it. No good purpose could be served by abstracting it here, or by adding anything to what has above been outlined, plus what will hereafter necesarily be set forth in dealing with the other questions to which we feel it proper to limit ourselves. It is sufficient to say that each of the justices has examined it with great care and it has been the subject of numerous conferences. We find death from arsenical poison sufficiently established, and that the only suggestions in the record indicating death from any other cause do not rise to the dignity of evidence. Motive and opportunity are sufficiently established and such incriminating conduct on the part of defendant as justified the jury in fixing responsibility upon him. Our unanimous opinion is that the verdict is supported by the evidence and that the conclusion of the jurors was correct.

2. Mrs. Divelbess testified, in part, substantially as follows: My visit to the Massie home February 1, was made in response to a telephone call received from defendant about 2 p. m., in which he told me he was terribly sick, that his wife was at home, and that I should take a taxi and come out about 4 o'clock. On my arrival at that hour I found the front door locked. Passing around the house I heard groans and knocked at the bedroom window, inquiring if anyone was at home. Defendant answered, "back door." I went there, found that door unfastened and went in. Defendant was in bed beside

his wife. In response to my questions he said he knew she was dead but did not know how long she had been dead and that he did not kill her. He asked why I did not call a doctor, saying he had been unable to do so because of his illness. To my question as to why he did not call a doctor instead of calling me he made no answer. He told me there were no neighbors at home who could be called (which was untrue) and thereafter when I proposed calling a doctor he twice protested. I did call Dr. Martin by telephone. He was slow in coming and I called him the second time. After his arrival defendant asked me not to tell him that he had 'phoned me. I asked him why he told me not to come until four o'clock. He said because he did not wish to frighten me. Thereafter I talked with him many times about what I should say if I were arrested. He said I was not to say anything about the 'phone call or about his talking to me through the window when I came out, and he suggested to me that the front door did not open easily. After I was incarcerated I received a note from him reiterating these things.

Defendant testified that after retiring at midnight he was totally unconscious of anything that occurred until late the following evening, his first recollection being of the presence in the house of Mrs. Divelbess, Dr. Martin, and some neighbors.

Defendant and his neighbor Loftus were served by a two party telephone, No. 178. The Loftus letter was W, that of defendant J. When a call comes over such a line the central office knows without inquiry the number but must get the letter from the caller. The hotel number of Mrs. Divelbess was Main 2113. One Clark, commercial manager of the telephone company, who had charge of the records of calls in and out of the Lakewood exchange, testified for the people and identified Exhibit Q as the "original two-number toll ticket" on a call placed from Lakewood 178W at 1:55 p. m. February 1, 1926, to Main 2113 Denver, and finished at 1:56 p. m. To this counsel for defendant objected because this ticket was

not properly identified by the person who made it. The objection was overruled and exception saved. Thereafter the witness, on cross-examination, identified a similar ticket of the same date showing a call from the Massie residence to the coroner at Golden and was proceeding in the same way to show a call from the same 'phone to the coroner of the City and County of Denver and the two calls to Dr. Martin, whereupon the necessity therefor was obviated by admissions of the district attorney, and counsel for defendant said: "Let the record show then that there was a 'phone call from Lakewood 178J to Main 4540, Dr. Edward Martin, the witness in this case, and from the same number to Main 4540, from 4:48 to 4:50, to Dr. Martin." After some redirect examination of the witness the district attorney offered in evidence Exhibit Q and no objection was made to the offer. Loftus and his wife testified that no one was at their house at the time of the call shown by Exhibit Q and no such call was made from their 'phone. The inevitable conclusion is that this was defendant's call to Mrs. Divelbess and that in making it he gave the operator the Loftus letter instead of his own. The objection of defendant's counsel to Clark's identification of Exhibit Q was trivial, save as preliminary to an objection to its introduction. Their own introduction of similar evidence by cross-examination of Clark, and their attempt to introduce more in the same way, forestalled only by the district attorney's admission, was a waiver of their original objection, which waiver was placed beyond question by their failure to object to the exhibit itself.

3. An alleged defense here was that deceased committed suicide. Defendant's counsel started to interrogate him about some affliction of which it appeared his wife had complained. His answer having been ruled out the following offer was made, objection thereto sustained, and exception saved:

"Mr. Cline (for the defendant): Let the record show that the defendant offers to prove that some time in

February, 1925, after the deceased had returned from a visit east, and after being with one F. E. Davis, she had a disease commonly known as venereal warts, a disease commonly associated with syphilis, and as a result thereof the deceased was very morbid, morose, and at a subsequent time thereafter, some time during September of the same year, 1925, the deceased made a statement that she was fearful that she had contracted syphilis, and she made a statement then and there that if she had contracted syphilis she would need no doctor to care for her, but rather an undertaker."

If the interrogatories just preceding this offer were not intended to elicit testimony bearing upon the theory of suicide it is difficult to comprehend their purport, yet it will be observed that this offer is immaterial for that purpose. At most it suggests only Mrs. Massie's fear that if she had the suspected disease she might die thereof. The ruling was correct. Thereafter the following occurred:

"Q. I will ask you to state whether or not, Mrs. Massie, your wife complained of any loathsome disease during the month of September, 1925?" (This is but a repetition of the offer with a change of date).

"Mr. Stone (for the people): We object to that.

"The Court: Sustained.

"Mr. Cline: Exception.

"Q. I will ask you what the mental attitude of your wife was with reference to the question which I have previously asked?

"Mr. Stone: We object to that.

"The Court: Objection sustained.

"Mr. Cline: Exception, and let the record show that in all of these questions" (quite evidently those relating to this particular defense) "the court has permitted counsel to make an offer of proof prior to the conclusion of this trial; is that agreeable?

"Mr. Stone: That you make an offer of proof?

"Mr. Cline: Yes,

"Mr. Stone:   Certainly.

"Q. I will ask you whether or not during the month of December, 1925, your wife at that time made any statement with reference to taking her own life?

"Mr. Stone:   We object to that as incompetent, irrelevant and immaterial.

"The Court:   Objection sustained. That is not connected with this transaction." (It will be noted that it is not so connected and relates to a time two months prior to the death. Its connection, if any, was evidently to be shown later by an offer).

"Q. I will ask you the same statement with reference to the month of January, 1926?

"Mr. Stone:   The same objection.

"The Court:   Sustained.

"Mr. Cline:   Exception.

"Q. I will ask you the same question with reference to the time that you arrived from Burlington the last time, which was the Tuesday immediately preceding her death—whether any such statement was made at that time?

"Mr. Stone:   The same objection.

"The Court:   Sustained.

"Mr. Cline:   Exception.

"Q. I will ask you whether or not your wife ever expressed an intention to take her own life with reference to or because of her sexual condition?

"Mr. Stone:   Object to that for the same reason, as hearsay.

"The Court:   Too remote; objection sustained." ("ever" certainly was too remote in any view of the answer).

"Mr. Cline:   Exception.

"Q. I ask the same question, limiting the time during the month of January, 1926?

"Mr. Stone:   Same objection.

"The Court:   Sustained.

"Mr. Cline:   Exception." (This evidently has some relation to two letters hereinafter mentioned).

"Q. I will ask you if during the month of January, 1926, your wife made a suggestion as to her suffering from the operation which had been performed?

"Mr. Stone: Object to that as hearsay.

"The Court: Well, if he confines it to the statement of suffering, whether she was suffering or not, it is admissible. Objection overruled.

"A. She did.

"Q. What did she say?

"A. She said she would never undergo another operation, and she would kill herself before she would; if she had known how much she would suffer from that operation she would never have underwent that operation."

Again it will be observed that this evidence was offered as bearing upon the defense of suicide, to which much of it had no legitimate relation. The operation referred to was a minor nasal operation not entirely successful. Some infection had resulted and was still present, but this woman nevertheless was apparently discharging her usual duties, taking pleasure trips and attending theaters. If she formerly had a venereal disease, as intimated, and had recovered, that fact could have furnished, at this late date, no possible motive for self-destruction. If such a disease had been contracted at the time suggested and not cured, the affliction had existed for almost a year and her husband must have had a knowledge thereof to which he makes no claim. Hence, as it stands, all this is unworthy of consideration as evidence of an intent to commit suicide. It certainly required some additional offer to connect this with the supposed defense. Within a few moments the following occurred (Defendant was being examined by his counsel concerning two letters and their envelopes, being Exhibits 37, 38, 39, and 40):

"Q. Did you ever see those letters in the possession of your wife?

"A. I did.

"Q. About what date? In January, 1926, was it?

"A. It was about the last week, it was right after I returned from Burlington, Colorado.

"Q. I will ask you whether or not at that time any statement was made by your wife while she was then reading the letters as to whether or not she would take her own life?

"Mr. Stone: We object to that as hearsay.

"The Court: Objection sustained, to her statements.

"Mr. Cline: Exception. That concludes the direct examination of Mr. Massie. We offer in evidence exhibits 37, 38, 39 and 40."

If this evidence was admissible because of its connection with the exhibits it does not so appear for the reason that these exhibits are not in the record.

This so-called evidence of statements by Mrs. Massie indicating an attempt to take her own life was clearly inadmissible under the rules laid down in *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204, and *Moya v. People,* 79 Colo. 104, 244 Pac. 69. This Moya decision in fact goes one step beyond the instant case. There evidence of the admission of a third person that he committed the crime with which defendant was charged was excluded as hearsay. How much more then should evidence of declarations of mere intent, as here, be excluded for the same reason. That there are cases to the contrary and able text writers, including Dean Wigmore, who support their reasoning, can not be disputed. We are therefore asked to reexamine the question and reverse our former holding. We would not shirk the reexamination, or hesitate to correct the error, should such clearly appear, even though convinced of the guilt of the accused and the sufficiency of the evidence to support the verdict, were this defendant in position to make the demand, but we think he is not. The general rule is that the exclusion of evidence will be reviewed only when a pertinent question has been asked and, on objection made, a definite offer to prove presented which will fully apprise the trial court of the character of the expected evidence and its admissibility. 2 R. C. L. p. 78, sec. 54. Such an offer is of course unnecessary where the question itself is of such a nature as to serve the purpose. It

clearly appears that it was the contemplation of both court and counsel that such an offer would here follow, and express leave was given, on defendant's request, to make it. It was never made. The formal insufficiency of the interrogatories on this subject, and the obligation of the defense to supplement them with a definite offer, is recognized in the reply brief, and our decision in *Stitt v. People,* 74 Colo. 70, 76, 77, 219 Pac. 205, is invoked to excuse the failure and justify our consideration of the question notwithstanding the omission. In the Stitt case the court, speaking through Mr. Justice Campbell, said: "The defects in the record, more or less technical, are such that the defendant might not be entitled to be heard at all. In the interests of justice, however, even if the prosecution had interposed the objection, we would not be inclined to allow the defendant's remissness in this respect to operate as a bar to a hearing in this court."

In reading that language it should be borne in mind that it was written with reference to a prosecution which this court, in the same opinion, thus characterized: "Whether the defendant is the guilty party is a grave question. That two juries were unable to agree is some indication that the question of his guilt is a close one."

This language has no application to the present case. Were it otherwise it might be urged with reason that the first quoted portion of the opinion was pertinent.

Defendant's instruction No. 11, tendered and refused, presents "the hypothesis of suicide." The authorities cited in support of it cover also such special defenses as alibi and self-defense, and are qualified by the statement that they "must be supported by the evidence and not covered by other instructions." If, however, the defense be unsupported by substantial evidence, and rest merely upon a remote inference, it is sufficiently presented to the jury if clearly within the general instructions. Such was the suicide theory in the instant case.

4. This information was filed March 8, 1926. Defendant was arraigned March 15, and on that date presented

his motion for an inspection and examination of the viscera and portions of the internal organs of deceased and that motion was denied. From its diagnosis of those portions of the body the state maintained death by arsenical poisoning, nothing more. If, under any circumstances, the motion was good its allowance seems clearly discretionary, reviewable only for gross abuse and none such is disclosed. It is clear from the record that at the time of the hearing on the motion the defense was apprised of the position of the prosecution and its claim of evidence of poisoning, yet it was not alleged that a further examination would in fact refute that claim, or that the movers so believed, or that they were doubtful on the subject. Defendant's authority which most nearly approaches the question is *State v. Bramhall,* 134 La. 1, 63 So. 603. It was there held: "In a prosecution for selling intoxicants without a license, where accused claimed that the liquors sold by him were nonintoxicating, the refusal of his request for the prosecution to furnish a sample for analysis is error."

If this language were otherwise applicable here its force is entirely destroyed by the defects in the motion.

5. Two complaints are made of counsel for the people: (a) Misconduct on the trial, i. e., unnecesasrily calling attention to defendant's moral derelictions, the vociferous manner of cross-examining him, and the language applied to him in argument. (b) That the prosecutor was responsible for false and prejudicial statements appearing in the public press, i. e., that he tried his case in the newspapers.

(a) The district attorney's method of cross-examination was doubtless unnecesasrily tumultuous, for the trial Judge answered objections to it by saying, "Don't talk to him quite so loud." However, methods of cross-examination differ as blades of grass, and the proper control thereof is necessarily vested in the discretion of the trial court. We can not say that discretion was abused here. The prosecutor also referred to Mrs. Divelbess as

defendant's "paramour," to defendant's assumption of illicit relations with her as "picking her up," and, in his closing argument, spoke of defendant as a "despicable coward," and an "out and out hypocrite," and reflected upon his conduct as a prohibition officer. The evidence afforded ample justification for the language complained of. It was unfortunate for defendant that at so critical a moment in his life his character and conduct were so interwoven with the transaction under investigation that they could not be ignored, and so reprehensible, and even criminal, as to testify against him in tones which required no emphasis from the tongue of the district attorney to carry into the jury box. But this record was written by defendant himself and was properly in evidence. In reading it to the jury no duty devolved upon the prosecutor to find pretty names for ugly deeds. Again we are unable to say that the discretion so wisely vested in trial courts to exercise general control and direction of the proceedings before them was here abused.

(b) If this record speaks the truth, and we have no reason to doubt it, if the district attorney presented his whole case to the jury, and we must presume he did, then the complaint that he previously tried a part of it in the newspapers, and being uncontrolled in that forum permitted fancy to appear as fact and clothed hope in the habiliments of fruition, is well founded. But there is nothing before us to indicate that this conduct, which was gross, or this error, which was flagrant, was in fact prejudicial or is reviewable. These newspaper articles appeared between March 3, and March 25. They formed a part of the basis for a change of venue, and the trial did not begin until six weeks later. Defendant was entitled to have them stopped by a collateral proceeding against the newspapers, the record discloses none; he was entitled to call the prosecutor to account if he was responsible for them, no attempt to do so was made. In their brief counsel for defendant say: "All the jurors who raised their right hands and swore to a 'true verdict

render' were so convinced of the guilt of the defendant long before a syllable of testimony ever fell from the mouth of the first witness, that argument, logic, reason, even evidence itself, were alike without avail to sway them from the preconceived belief of the guilt of the defendant."

This is indeed a dark picture, but the brush which painted it was dipped in colors obtained elsewhere than in this record. If any question was asked of a juror on this subject, if any had read these articles or were prejudiced thereby, if any was excluded from service therefor, we are not apprised of it. The record is silent on the subject.

So numerous, however, have been similar complaints in this jurisdiction in the past, and in some instances apparently so well founded, we cannot, before leaving this branch of the case, refrain from calling the attention of officers and newspapers to the cases of Ex parte Sturm, and Ex parte Burns, both tried before Judge Eugene O'Dunne, of the Supreme Bench of Baltimore City, sitting in the criminal division. The Sturm case is reported in 136 Atl. 312, and was published in the Daily Record, Baltimore, January 24, 1927. The Burns case was published in the last mentioned periodical January 5, 1927. Both appear in the February Journal of the American Judicature Society. The opinions in these cases set forth some of the principles which should guide public officials and the public press in dealing with pending litigation, review the history of the subject, and cite the greatest and soundest authorities. They have received nation wide notice and almost universal approval. We recommend to those interested their careful perusal. Reversible error in cases of great public importance, new trials with their attendant difficulties and often enormous expense, and unpleasant and unnecessary litigation involving officers and newspapers having no desire to transgress the law or embarrass its administration, may thus be avoided.

We think there is nothing further in the bill of exceptions requiring notice save possibly to suggest that the contention of failure of proof of the corpus delicti is fully answered in *Lowe v. People,* 76 Colo. 603, 611, 234 Pac. 169.

Finding no reversible error in the record the judgment is affirmed.

MR. JUSTICE DENISON and MR. JUSTICE BUTLER dissent only on the questions of the defense of suicide and the examination of the viscera. Mr. Justice Denison agrees that the rulings of the trial court on the suicide evidence are supported by our decision in the Moon-Ausmus case, but thinks that decision wrong and that it should be overruled. He agrees that defendant's request for an examination of the viscera was addressed to the discretion of the court, but thinks the motion sufficient and the discretion abused.