No. 14,768.

STEPHENS *v.* THE PEOPLE.
(111 P. [2d] 1057)

Decided March 24, 1941.

Mr. R. FRANKLIN MCKELVEY, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. GERALD E. MCAULIFFE, Assistant, Mr. GAIL L. IRELAND, Attorney General, Mr. J. S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE BAKKE delivered the opinion of the court.

THIS is a criminal case in which plaintiff in error, to whom reference is hereinafter made as defendant, was

convicted of murder in the first degree and sentenced to death. He seeks reversal on a writ of error.

The facts briefly stated are substantially as follows: October 9, 1939, defendant, who had been drinking, entered the Columbine Tavern in Mancos, Montezuma county, where he visited with Frank Kratz and Dale Davidson while they drank some whiskey. Defendant had an old pistol with him which he testified he was trying to sell to Davidson, who was unable to purchase it because of lack of funds. A heated argument ensued between defendant and Kratz which finally became so violent that the victim of the homicide, Lynn Dean, the town marshal, interfered and ordered defendant to go home. Defendant left the Columbine Tavern, walked a couple of blocks, crossed the street and went to the Blue Moon Cafe, which was also a tavern, where he had another drink. Dean followed him and again told him to go home. Defendant obeyed, but only remained there for a few minutes when he again returned to the Columbine. Kratz was still there and the argument was renewed. This time Dean asked defendant if he had a gun and he replied that he did have. There is dispute as to what was done with the gun, but defendant apparently still had it when he left the Columbine the second time. McGregor, the only eye-witness to the tragedy, testified that he saw Dean take defendant by the arm and lead him toward the jail; that at the door of the jail an altercation occurred, which ended with defendant shooting the marshal; that witness ran to the scene and jumped on defendant, at which time he saw the gun in defendant's hand; that he knocked defendant unconscious with his flash light and after hiding the gun at the corner of a nearby building, ran back to the Columbine for help, following which defendant was placed in custody, the gun recovered and turned over to the authorities.

Consistently with the presentation of his motion for a new trial, defendant here argues that two assigned

errors necessitate reversal: (1) Refusal to grant a change of venue and the resultant unfairness of the trial held; (2) alleged misconduct of juror Rausher.

■ 1. Defendant's principal contention is grounded on the refusal of the trial court to grant a change of venue because of the alleged prejudice against him in Montezuma county in which the crime was committed. It is admitted that several newspapers within the county published articles and commented editorially on the crime, containing statements such as "the case of Jim Stephens is a blot on the respectability of the whole county," and "that Stephens had always been regarded a questionable character. On several occasions, when drinking, he talked of killing this or that person who might cross him"; that defendant was a "particularly offensive breed of skunk," and other references similarly critical and derogatory. As factual recitals, some newspaper accounts informed the public that mob violence was threatened in Mancos and that defendant had been quickly removed from that place to avoid anything of the kind. Immediately after arraignment, his counsel in a motion for change of venue submitted copies of various newspaper clippings containing the above statements, and other similar ones, and filed a large number of affidavits in which statements were made that because of the prejudice of the citizens of Montezuma county it would be impossible for defendant to have a fair trial in that county. The district attorney, on the other hand, filed approximately the same number of affidavits by other residents of the county to the effect that defendant could receive a fair trial, and the judge who was presiding when the motion was heard denied the same. He requested another judge to preside at the trial, which occurred several months later.

We should say in passing that the statements above quoted were not typical of the newspaper accounts of the crime. Most of the clippings appearing in the record were ordinary news items relating the story of what

happened, without defamatory comment, and were not such as would tend to arouse any particular passion or prejudice.

In the record at hand, the entire examination of all of the jurors is before us and it appears that only one prospective juror said that he had formed any opinion as to the guilt of defendant, and he was promptly excused. Most of the members of the jury had not even seen the editorial upon which reliance was principally based as creating prejudice, and several stated that they had not read any newspaper accounts of the crime. Those who had read such accounts stated that they had formed no fixed opinion concerning the guilt or innocence of defendant. Defendant used only nine of his fifteen peremptory challenges. These circumstances are not particularly consistent with the state of prejudice claimed by the defendant. "Undoubtedly, newspaper articles containing criminal accusations produce considerable effect upon public opinion and thus occasion much difficulty in securing impartial jurors; but as a rule, citizens who are fit to try criminal cases will not allow previous opinions based upon unofficial reports to control their judgment against the sworn evidence in a case. * * * If a publication be too violent or denunciatory it is not likely to have as much influence upon thoughtful minds as a more temperate article. Intelligent citizens understand that verdicts should be based upon opinions formed only upon sworn evidence given by reliable witnesses—evidence which has stood the test of cross-examination, and, perhaps, adverse testimony— and not upon ex parte statements." *Power v. People,* 17 Colo. 178, 28 Pac. 1121. The trial court likely viewed the situation in the case at bar in this light. Neither do we think the circumstance that the inhabitants of the town of Mancos, the locus of the crime, might have been prejudiced against the defendant—conceded by the people's affidavits—would in itself conclusively establish prejudice in the body of the entire county. The remarks

of the district judge who ruled upon the motion for change of venue, disclosed that he considered this element and decided that it did not attain the significance claimed by defendant. As we have indicated, the subsequent examination of the jurors on their voir dire would seem to confirm such conclusion. *Giacomozzi v. People,* 72 Colo. 13, 209 Pac. 798. No one from Mancos sat on the jury as finally selected. We see no such abuse of discretion here as would justify a reversal of the judgment, and it should be borne in mind that two judges had opportunity to consider the matter—one, who heard the motion for a change of venue, and the other, who heard the examination of the jurors touching their qualifications and who passed upon the motion for a new trial.

2. As to the alleged misconduct of a juror. It appears that one of the jurors had conversed with a woman on the evening of December 6th, during the trial, and had accepted from her "a note, or slip of paper, the contents thereof being unknown to affiant."

At a hearing on the affidavit filed in connection with this statement, the juror testified he was handed a brown envelope by his wife, as she corroborated, containing his tooth brush, tooth paste and a five-dollar bill. He asked the other jurors if any of them could change the bill, and as none of them was able to do so, he walked across the street to a filling station, where he had it changed, giving a part of the money to his wife and keeping the balance; all of which occurred in the presence, and with the consent, of the bailiff. Not a word passed between the juror and his wife concerning the trial of the case, nor was there any writing of any kind in or on the envelope. We think no prejudice to the defendant could possibly have resulted from this occurrence.

Our analysis and study of the entire record satisfies us that defendant had a fair trial.

The judgment is accordingly affirmed and it is ordered that it be executed during the week commencing Monday, April 28th, 1941.

MR. JUSTICE OTTO BOCK and MR. JUSTICE HILLIARD dissent.