No. 19,377.

WALTER J. HAMMIL *v*. PEOPLE OF THE
STATE OF COLORADO.
(361 P. [2d] 117)

Decided March 13, 1961. Rehearing denied May 1, 1961.

Mr. WALTER F. SCHERER, Mr. HAROLD A. MACARTHUR, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

PLAINTIFF in error, who will be here referred to as defendant, was convicted of first degree murder and sentenced to death. It will be sufficient for the purpose of this review to merely outline the essential facts surrounding the happenings which furnish the basis for the

charge and it will be unnecessary to detail all of the shocking and sordid facts which appear in the record.

On August 27, 1958, Lester Gordon Brown, Jr., an eleven-year-old boy, went to the Denver Coliseum where a circus was appearing. While watching the animals at the circus he talked to the defendant and was told by the latter to come back that evening if he wanted to ride one of the elephants. The boy returned that evening in company with another boy and was taken inside the building by the defendant. After having some conversation with Lester Brown, defendant and the boy went for a walk. Some distance from the circus area the defendant made improper advances to the boy and the latter, according to the confession of the defendant, protested and asked to go home. Defendant admitted that he was afraid that the boy would inform his parents and that on a sudden impulse he started to choke Brown. As a result of this, Brown fell to the ground and defendant left the scene and went to a neighboring restaurant where he had dinner. He then returned to the barn and after a short time went back to the place where the body of the boy was. Finding that he was dead, he carried the body to a nearby sand pile and buried it. The next day defendant was arrested. He confessed all of the details and led the officers to the shallow grave.

The only issue relating to sufficiency of the evidence to establish the charge of murder has to do with the element of premeditation. A question is raised concerning the length of time essential to existence of such element. Apart from this one point dealing with the merits, the assigned errors pertain to the alleged insanity of the accused.

There were two trials. The first was limited to defendant's plea of not guilty by reason of insanity. Following a verdict of the jury that defendant was sane at the time of the commission of the offense, trial was had on the charge. During the course of the latter trial, evidence of the defendant's mental condition was intro-

duced, but was limited to the issue whether defendant had sufficient capacity to deliberate and as an aid to the jury in finding the degree and in determining punishment. *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109. There was testimony at both trials bearing on the question whether the defendant was sane at the time of the commission of the offense. The prosecution called Dr. James A. Galvin, Medical Director of the Colorado Psychopathic Hospital, and also Dr. John MacDonald, a member of the staff of Colorado General Hospital. At the second trial the defendant called Dr. Doris Gilbert, Clinical psychologist, who had conducted certain psychological tests on defendant. Dr. Jack Hilton was called on behalf of the defendant. He testified that in his opinion the defendant was insane at the time of the alleged commission of the offense. The jury verdict at the insanity trial found that defendant was sane. At the trial on the merits the jury again rejected the contention of defendant that he was insane.

The present review applies to both the sanity trial and the trial on the charge contained in the information. On the sanity issue, error is assigned in connection with the refusal of the trial court to allow defendant to cross examine Dr. James A. Galvin regarding the use by the latter of a certain psychological report prepared by Dr. Doris C. Gilbert (who was not in court). The alleged error is based upon the contention of the defendant that the witness Galvin was shown to have read the report and, according to the defendant, to have used it in a limited way for the purpose of furnishing suggestions incident to his own investigation. The court's ruling sustaining the objection of the prosecution and striking all of the cross examination having to do with the contents of this report, was, it is argued, prejudicial error.

In connection with the trial of the case on the merits error is assigned:

1. To the court's ruling on the admissibility of various photographs and exhibits which, it is alleged, were

prejudicial to the defendant and lacking in probative value and deprived the defendant of a fair trial.

2. To refusal of the court to allow defendant to cross examine Dr. John MacDonald as to the practical impossibility, from a medical standpoint, of premeditating "as quickly as one thought follows another."

3. To instructing the jury that deliberation as elsewhere defined does not require any particular time; that it may occur "as quickly as one thought follows another"; that even assuming the propriety of such instruction in proper circumstances, it was not applicable to the facts presented in the case at bar.

4. To refusal of the court to instruct in accordance with the defendant's tendered Instruction No. 1, which was substantially similar to the court's Instruction No. 11. Both sought to define "wilfully, deliberately and with premeditation." The court's instruction included the statement objected to by defendant that:

"It matters not how short a time interval, if it were sufficient for one thought to follow another."

The defendant's instruction merely stated:

"No particular time need intervene between the formation of the intent to kill and the act of killing."

Thus Assignment No. 4 points up the identical issue raised in Assignment 3.

## I.

The alleged error emphasized most strongly is the ruling of the trial court restricting the cross examination of Dr. James Galvin preventing defendant from inquiring about the report of Dr. Gilbert, the psychologist. Thus, the question is whether it was error to restrict the cross examination of this psychiatrist relating to the contents of the report of a staff psychologist. It appears from the evidence that Dr. Gilbert conducted a series of psychology tests with a view to obtaining information as to the intelligence level and emotional makeup of the defendant. Dr. Galvin denied that he utilized this report in forming his opinion, and maintained that his opinion

was entirely the result of his own observations. Although Dr. Galvin consulted with Dr. Gilbert, it is inferable from the record that he refrained from consulting it until he had forwarded his opinion to the court. This report, of course, was a part of the defendant's chart and was available to Dr. Galvin and, in fact, was consulted by him after he had concluded that defendant was sane.

The proposed cross examination of Dr. Galvin consisted of questions designed to bring out the contents of the psychologist's report, which disclosed defendant to have low grade of mentality and character, and contained various statements which could have led the jury to believe that the defendant's low mental level and anti-social attitude precluded his responsibility for acts or conduct proscribed by the law. From defendant's offer of proof, the object of the questions which he proposed to propound to Dr. Galvin was to direct to the jury's attention the contents of the report — the conclusions of the psychologist. The Gilbert report had no tendency whatever to discredit Dr. Galvin's statement that he relied only on his own observations, since nothing which appeared in the report, and which could have been brought out in the cross examination, would have had a tendency to establish Dr. Galvin's opinion as based on hearsay. Since Galvin testified positively and emphatically that he was not influenced by the report, a further extensive examination of Galvin as to the contents of the report could have no tendency to undermine his statement that he did not rely thereon in forming his own judgment, and would serve only to place its hearsay contents before the jury in such manner as to give its contents testimonial status.

■ In view of this circumstance, it seems clear that defendant failed to bring himself within the terms of *Ingles v. People*, 90 Colo. 51, 6 P. (2d) 455, where it was held that a physician's report in a criminal insanity hearing, based in part on information furnished by

others, is itself incompetent as being derived from hearsay evidence. It was there said:

" * * * You cannot express an opinion based, in whole or in part, upon information obtained from third persons who have not testified to the facts."

The proposed questions in the present case had no tendency to establish that Dr. Galvin's opinion was based on other than his own observations.

It is further urged by the defendant that *Archina v. People,* 135 Colo. 8, 307 P. (2d) 1083, is pertinent. It was there held that refusal to allow cross examination of a doctor (called by the people) as to the effect on his opinion of certain reports and documents which had been submitted to him by the District Attorney, constituted error. The documents there submitted to the physician included a confession of the defendant, various statements of witnesses in the case pertaining to the circumstances surrounding the perpetration of the offense, and a digest of the evidence prepared by the deputy district attorney. The trial court had ruled that cross examination as to the extent, if any, that these documents entered into the opinion of the physician was not proper cross examination. It was held that since the questioning proposed to establish that the doctor's opinion was based in part on hearsay, the refusal of the court to allow the tendered examination effectively deprived the defendant of an important right. The case at bar is different. The cross examination here was not designed to establish such fact. The trial court considered the entire matter in a *voire dire* hearing and reached a carefully considered conclusion which did not violate discretionary limits. We conclude that no error was committed in such ruling. See *Power v. People,* 17 Colo. 178, 28 Pac. 1121; *Massie v. People,* 82 Colo. 205, 258 Pac. 226; *Montgomery v. People,* 117 Colo. 118, 184 P. (2d) 480.

We find no merit in the contention of defendant that Dr. Galvin became disqualified as an expert as a

result of his admission in a prior public speech that a psychiatrist is no more qualified to determine the capacity of an accused to recognize right and wrong than a plumber. The question of Dr. Galvin's qualifications was for the court, and even though Dr. Galvin may have entertained a low opinion of the abilities of those engaged in his professional calling, he still would not have been disqualified in the face of evidence of his prior training and experience, together with the court's conclusion that he was qualified. See *Ausmus v. People,* 47 Colo. 167, 107 Pac. 204, and *Moss v. People,* 92 Colo. 88, 18 P. (2d) 316. The court had a right to decide that Dr. Galvin's prior allegedly inconsistent statement was merely an expression by him of the psychiatric viewpoint as to the infirmities of the so-called right and wrong test.

## II.

It is argued that the photographs taken before, during and after the time defendant was questioned and while he was giving the statement which was later received in evidence, were completely lacking in probative value and could only serve to prejudice the defendant in the eyes of the jury. These photographs depicted the accused surrounded by police officers in the act of being questioned and later as he read the statement. Others showed him signing his name. The photographs were offered for the purpose of qualifying the confession as having been voluntarily given and to show the mental condition to the extent that it would appear from such photographs. An officer testified that the defendant was handcuffed and chained, but this is not apparent from the pictures. Even though the defendant did not expressly raise the issue of voluntariness, we are unable to conclude that the court committed error in admitting these photographs. Strictly speaking, there was probably no issue of voluntariness until such time as the accused raised the question. Nevertheless, we do not consider the trial court's ruling allowing the prosecution

to qualify the confession in anticipation of such an issue as erroneous. The photographs merely illustrated the scene which had been described by the witnesses who testified concerning the confession, and qualified photographs are always admissible to express what has been described by words. See *Green v. City and County of Denver,* 111 Colo. 390, 142 P. (2d) 277, citing Wigmore, *Evidence,* sec. 792 (3d ed. 1940). Cf. *Potts v. People,* 114 Colo. 253, 158 P. (2d) 739. See also *Bruner v. People,* 113 Colo. 194, 156 P. (2d) 111, and *Moya v. People,* 88 Colo. 139, 293 Pac. 335. The specific question here argued was raised in *Martinez v. People,* 124 Colo. 170, 235 P. (2d) 810. In the opinion of Mr. Justice Moore, the basis for the defendant's objection is described as follows:

" * * * The photograph, Exhibit G, was taken at the time defendant signed the confession and shows him as he affixed his signature to it in the presence of detectives. Exhibit K is a photograph showing the defendant and several policemen in the office of the captain of detectives. The defendant was shown with a paper in his hand and testimony in explanation of the exhibit was to the effect that the picture was taken while the detectives were reading the confession aloud to defendant prior to the time it was signed by him. * * * "

In commenting on the evidence which had been received in *Martinez,* supra, the Court said:

"No error was committed by the trial court in the admission of these pictures.

\* \* \*

"The objections to the pictures of defendant taken at detective headquarters at the time of the reading and signing of the confession were, that the pictures would not 'disclose anything that preceded the taking of the picture or anything in connection with the taking or making of any statement,' and generally that the pictures lacked probative value. These objections go only to the weight of the evidence and not to the question of its admissibility, and are without merit."

The rule announced in the *Martinez* case is the generally accepted viewpoint. See Melville, *Criminal Evidence* 246 (2d ed. 1954), 2 Underhill, *Criminal Evidence* sec. 400 (5th ed. 1956). In 2 Wharton, *Criminal Evidence* sec. 353 at 49, the author says:

"The prosecution may offer in evidence testimony, photographs, or motion pictures to show the condition of the defendant at, or before and after, the time of making the confession, or to show the making of the confession. However, there is no duty resting upon the prosecution to anticipate or refute affirmatively testimony as to improper inducement of the confession before such testimony is actually brought into issue by the party seeking to show that the confession was involuntary."

The decisions collected in *Underhill*, supra, hold that many states require the prosecution to establish the voluntariness of a confession in the first instance. Other jurisdictions do not enforce such a requirement. This Court has not ruled expressly on the issue whether a confession is presumed to have been voluntarily given. The trial court was undoubtedly acting in the spirit of caution when it allowed this evidence notwithstanding that no issue had been raised. There can be no criticism of a ruling which permits testimony of observing witnesses as to the circumstances in the giving of a confession even prior to the creation of an issue. In view of this, we are unable to perceive error arising from the order receiving actual photographs.

### III.

We turn now to the propriety of instructing the jury that no particular time need intervene between the formation of the intent to kill and the act of killing — that it may occur if there is enough time for one thought to follow another. We first inquire whether this instruction is invalid *per se*.

We note first of all that this instruction has been upheld many times in the past: *Van Houton v. People*,

22 Colo. 53, 43 Pac. 137; *Robinson v. People,* 76 Colo. 416, 232 Pac. 672; *Maestas v. People,* 91 Colo. 36, 11 P. (2d) 227; *Sandoval v. People,* 117 Colo. 588, 192 P. (2d) 423. It is almost universally held that no particular time need pass in order to establish deliberation and premeditation. The important thing is that the jury be told that there must be at least enough time to permit one thought to follow another. In the several California cases relied on by defendant, the trial court mistakenly created the impression that there can be premeditation even though the thought be executed the very instant it is conceived. It is obvious that an impulsive killing cannot be first degree murder, but a fair reading of the trial court's Instruction No. 11 creates no such impression. It is a careful precautionary admonition which underlines the necessity for the defendant to, in fact, premeditate and deliberate prior to homicide in order for his offense to be within the requirements of murder in the first degree. The law does not demand that a defendant shall have premeditated for any period of time. It only demands that the defendant shall have committed the act deliberately and with premeditation. The particular wording of Instruction No. 11 was peculiarly applicable to the evidence adduced in the case at bar because the act followed the intent within a relatively short time. It was important that the jury be informed as to the meaning of premeditation and deliberation. However, a fair reading of the court's instruction furnishes no basis for asserting that confusion could have existed in the minds of the jury. It is to be further observed that defendant's tendered Instruction No. 1 which told the jury that no particular time need intervene is not substantially different from Instruction No. 11. Therefore, we perceive no merit in questioning the giving of Instruction No. 11, while objecting to the refusal to give defendant's tendered Instruction No. 1.

Being of the opinion that the trial was carefully conducted by a highly competent trial judge and that the

defendant was very adequately represented by most capable appointed counsel, and that no error resulted, the judgment should be and is hereby affirmed, and it is ordered that the same be executed during the week beginning May 8, 1961.

Mr. Justice Frantz dissents.

Mr. Justice Frantz dissenting:

For the first time so far as my research reveals, an attack is made upon a stock instruction which has uniformly been given in homicide cases. As early as 1895 in the case of *Van Houton v. People,* 22 Colo. 53, 43 Pac. 137, the instruction received the sanction of this court.

The instruction being assailed is Number 11, which defines first degree murder. In the course of the instruction the trial court charged the jury:

" 'Deliberation' means an intent to kill, executed by the slayer in a cool state of blood, in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under the influence of a violent passion provoked by some cause calculated to override the judgment. 'Premeditated design to kill' means a previously designed or formed intention to kill. * * * The law * * * does not require that the willful intent, premeditation or deliberation should exist for any particular length of time before the killing. * * * No particular time need intervene between the formation of the intent to kill and the act of killing. It matters not how short the interval, if it was sufficient for one thought to follow another. It is sufficient if deliberation was had to form a design or purpose to take life and to put that design or purpose into execution."

In criminal law, responsibility is always relative. The standards of the ordinarily prudent man or of the normal person, commonly resorted to in the law concerning civil liability, have no application to criminal law.

Thus understood, abstract statements of law set forth in a charge to the jury are laden with an element of danger and should not be given. Instructions should be framed in terms applicable to the particular case being considered. *Gill v. People,* 139 Colo. 401, 339 P. (2d) 1000; *Harris v. People,* 32 Colo. 211, 75 Pac. 427.

Here we are considering an instruction stated in the most general terms in a form truly abstract and in no manner appropriate to the case being considered.

Hammil is, according to the experts who testified, a very unstable person having below normal intelligence — in fact, a borderline intelligence, being just above the mental defective range. Moreover, he is suffering from a form of character disorder which might be called a sociopathic personality disorder.

In the light of the mental make-up of Hammil, the expert was asked on cross-examination whether it was medically and psychiatrically possible to form an intent to murder "as quickly as one thought follows another." An objection to this question was sustained, and the sustention thereof is assigned as error.

An objection was also made to giving of the instruction advising the jury that it mattered not how short the interval might be in forming the intent, premeditation or deliberation, "if it was sufficient for one thought to follow another." It was asserted that such instruction was confusing, misleading and self-contradictory; that it destroyed the distinction between first and second degree murder and that it stated an academic definition of murder in the first degree.

If we are to apply the standard that intent, premeditation and deliberation are processes which may require no interval of time but may be formed as quickly as one thought follows another, it should not be in a schoolmaster's terms, as an exercise in cerebration. Again, let us remember that responsibility in criminal cases is always relative. Actually, the instruction would have been proper if couched in terms permitting the jury to

consider the speed with which a thought of Hammil's might follow another of his thoughts. Hammil is, without dispute in the evidence, a person of very low grade intelligence and his thought processes could properly be viewed by the jury as moving with less celerity than would be expected of a person of normal intelligence.

Certainly the speed with which one thought follows another in the mind of the "normal person" or the "ordinarily prudent man" is not the test. And yet, the jury in its deliberations may have considered responsibility in such a setting. It may have applied to Hammil the test of speed of the thought processes as such would be formed by a normally intelligent man.

Malice is sufficient to establish murder in the second degree. In order to establish murder in the first degree the ingredients of premeditation and deliberation must also be proved. It thus becomes obvious that the giving of this instruction was most important in determining whether Hammil committed first or second degree murder.

If the question put on cross-examination had been permitted an answer, the doctor might have shown that the intent, deliberation and premeditation could have been formed by Hammil as quickly as one thought follows another, but would be a much slower process than would occur in the average or intelligent person. The jury had the right to be advised on this and to evaluate its effect in arriving at its verdict.

An instruction very similar to the one given here was condemned in the case of *McDonald v. State,* 78 Miss. 369, 29 So. 171. The words discountenanced were: "if the design to kill exists but for an instant." The entire disapproved instruction reads as follows:

"The court instructs you, for the state, that, while premeditation and malice aforethought are necessary ingredients in the crime of murder, this does not mean hatred or ill will, but means the same in law as deliberate design, and need not exist in the mind of the slayer

for any definite time, — not for days or hours, or even minutes; but, if the design to kill exists but for an instant at the very time the fatal blow was struck, this is sufficient premeditation to constitute the offense."

An interesting discussion of some phases of this problem can be found in 46 Col. L. Rev. 1005 under the title, "Premeditation and Mental Capacity," and in 1 Wharton, Criminal Law and Procedure, §41, p. 92, under the subheading, "Subnormal Mentality."

Because of these matters, I would urge my confreres to reverse the judgment in this case.